IN THE CIRCUIT COURT FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

EDWARD A.H. SIEDLE,

    Plaintiff,

v.                       Case No:    02 04303

NATIONAL ASSOCIATION OF       Division:
SECURITIES DEALERS, INC.

    Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Edward A.H. Siedle ("SIEDLE") sues Defendant National Association of Securities Dealers,

Inc. ("NASD") and alleges the following:

### Jurisdiction

1.     This action is for declaratory and injunctive relief.

### Parties

2.     SIEDLE is an individual residing in the state of Florida.

3.     NASD is a non-profit corporation duly organized under the laws of the state of Delaware, is

authorized to conduct business in the state of Florida, and conducts business in Hillsborough County,

Florida.

4.     On information and belief, through its subsidiaries NASD Regulation, Inc., NASD Dispute

Resolution, Inc. and the American Stock Exchange®, NASD develops rules and regulations, conducts

regulatory reviews of members' business activities, and designs and operates marketplace services and

facilities. NASD helps to establish and coordinate the policy agendas of its subsidiaries and oversees their

effectiveness.

5.　　SIEDLE's dispute with NASD centers around NASD's attempts to block the publication of a directory that would profoundly enhance the public's ability to make informed decisions by unrestricted and open access to brokerage firm disciplinary histories.

6.　　SIEDLE is a former attorney with the SEC and former associate counsel and director of compliance for a major money management company.

7.　　He is currently president of Benchmark Financial Services, Inc. located in Lighthouse Point, Florida, which is a broker dealer registered with the NASD.

8.　　In his job-related activities, SIEDLE conducts investigations of money managers and brokerage wrongdoing on behalf of pension funds.

9.　　SIEDLE is a known commentator on the securities industry and publishes articles regarding the industry.

10.　　SIEDLE is publishing *The Siedle Directory of Securities Dealers* ("*The Siedle Directory*").  A copy of the introductory narrative and several exemplar pages relating to broker-dealers is attached hereto as Attachment A.

11.　　SIEDLE has included in *The Siedle Directory* the regulatory data contained on the Central Registration Depository ("CRD") that serves as a source for NASD's Public Disclosure Program ("PDP") through its website.

12.　　The purpose of *The Siedle Directory* is to inform and protect the public investor community by collecting the data by firm in a user-friendly manner and by analyzing and commenting on the data.

13.　　SIEDLE's use of the information is on its face congruent with the objectives of NASD's PDP and makes public CRD disciplinary information more readily available to the public.

14.     The CRD is administered by both NASD through its subsidiary NASD Regulation, Inc. and the North American Securities Administrators Association under the oversight of the United States Securities and Exchange Commission ("the SEC").

15.     The CRD information is required to be provided by member firms and associated persons to NASD, which acts as central repository of the data.  The CRD data is input into the CRD system by NASD.

16.     Certain CRD information is public.  In fact, under the statutory mandate of 15 U.S.C. §780-3(I) NASD enacted the PDP through Interpretive Material 8310-2.

17.     The PDP and CRD system was enacted in part, "to provide investors with important information about the professional background, business practices and conduct of their members and their associated persons."  See NASD Notice To Members 00-16.

18.     Notably, the PDP does not place any restrictions upon the use of public CRD information and provides in pertinent part:

> In response to a written inquiry, electronic inquiry, or telephone inquiry via a toll-free telephone listing, the Association shall release certain information contained in the Central Registration Depository regarding a current or former member, an associated person or a person who was associated with a member… See IM-8310-2(a)

19.     The principal purpose of the PDP "is to help investors make informed choices about the persons and firms with whom they may wish to do business".  See NASD Special Notice To Members 98-71.

20.     NASD has referred to its policies under the CRD system as fulfilling its "mission of protecting investors."  See NASD Notice To Members 01-65.

21.     NASD has not taken the position that the information is non-public or copyrightable, nor could it.

22.     NASD in furtherance of its statutory mandate and under the PDP has established a website to make the CRD information available to the public.

23.     Moreover, NASD "continues to work with the SEC and Congress to seek legislation that it believes is necessary in order to provide for the display of all disclosure information via NASD Regulation Web Site" at www.NASDR.com.

24.     NASD's website, however, contains a "click agreement" prior to entering a request for CRD information.  NASD interprets this agreement as restricting the use of information under the PDP via the website.

25.     The original click agreement ("the First Click Agreement"), a copy of which is attached hereto as Attachment B, purports on its face to be an effort to comply with NASD's statutory public disclosure mandate pursuant to 15 U.S.C.  §780-3(I).  A plain reading of this click agreement, however, reveals that NASD did not prohibit the commercial use of the information.

26.     Under the PDP terms and conditions information provided through the PDP can be used as follows:

"a.     to assist in determining whether to conduct or continue to conduct securities or commodities business with NASD® Member Firms or Associated Persons;

b.      In judicial proceedings or arbitration proceedings relating to securities or commodities transactions; or

c.      for other non-commercial purposes consistent with the promotion of just and equitable principles of trade and the protection of investors and the public interest."

27.     The PDP terms and conditions contained in the First Click Agreement did not prohibit commercial use of the information for purposes (a) and (b).  Indeed, subparagraph (c) does not modify (a) and (b) at all because of the use of the disjunctive "or".

28.     Therefore, to the extent SIEDLE is currently using the information in *The Siedle Directory* for purposes (a) and (b), there is no agreement with NASD preventing him from so doing.

29.     On or about March 12, 2002, in response to SIEDLE's obtaining information for *The Siedle Directory* as described in more detail below, the First Click Agreement was revised to close what NASD perceived as "loopholes".    A copy of the revised Click Agreement ("the Second Click Agreement") is attached hereto as Attachment C.

30.     The Second Click Agreement which appears on NASD's website is far more restrictive than the First Click Agreement and states in part:

> 5.     In no event may you offer to others any information retrieved from the PDP for commercial purposes, or as part of a subscription service or similar arrangement.  You agree that you will not use the information retrieved from the PDP web site to develop or create a database of information to be sold, licensed or made otherwise commercially available.  You agree that you will not use any robot spider, other automatic device, or manual process to monitor or copy the PDP information in bulk, or to make voluminous, excessive or repetitive requests for information.  You further agree that you will not use any device, software or routine to bypass any software or hardware that prohibits volume requests for information, you will not interfere with or attempt to interfere with the proper working of the PDP Web site, and you will not take any action, that imposes an unreasonable or disproportionately large load on the Web site.  See Click Agreement, ¶5.

31.     Under the Second Click Agreement, NASD maintains that SIEDLE and (presumably any others who attempt to access CRD information through the website) is restricted not only in his use of the information, but also the method and manner of accessing the information.

32.     Notably, NASD is now attempting to effectively limit SIEDLE's use by prohibiting volume requests.  However, as discussed below, NASD has not suggested that SIEDLE's method of accessing the

website was improper or disruptive. Rather, the access restriction is designed to block SIEDLE from publishing *The Siedle Directory*.

33. SIEDLE downloaded the CRD information from NASD's website consistent with the underlying policies of NASD's statutory mandate and the PDP after full disclosure to NASD and without any impact or interference to NASD's system.

34. On July 20, 2001, SIEDLE wrote to Mr. R. Clarke Hooper of NASD's Office of Disclosure And Investor Protection and to Ms. Annette Nazareth of the SEC's Division of Market Regulation.

35. In that letter, SIEDLE outlined his proposal to create *The Siedle Directory,* which would provide the following information:

- a list of the regulatory history of all NASD member firms;

- a list by town or city of all NASD member firms; and

- a possible rating system, which would be SIEDLE's opinion.

36. Chief Counsel/Director of CRD/Public Disclosure at NASD, Richard Pullano ("Pullano"), responded to SIEDLE's letter with a telephone call to SIEDLE on or about August 27, 2001 during which they discussed *The Siedle Directory*. SIEDLE also discussed that he did not need to access the data through the website if NASD would provide the data in an alternative form. Additionally, SIEDLE informed NASD of his ability to access the data through a hired programmer or secretarial pool via the website.

37. Pullano indicated no preference as to the method SIEDLE would employ in obtaining data via the website, but indicated orally that NASD did not believe that it would provide enhanced access.

38. On that same day, SIEDLE wrote to Pullano stating that he believed that *The Siedle Directory* would supplement, and not replace, the CRD as accessible through the PDP.

39. SIEDLE's letter listed several advantages to *The Siedle Directory*, all of which would serve NASD's stated goal of benefiting and protecting the public, including:

- affords unlimited number of inquiries compared to the limited current system;

- permits the reader to simultaneously compare one firm's disciplinary records against another; and

- provides the reader with an overview of industry norms.

40. On October 2, 2001, Pullano responded to SIEDLE's letters of August 1, 2001 and August 27, 2001 by reiterating his understanding of *The Siedle Directory*. Pullano affirmed that "while we do not object to your accessing the Public Disclosure Program consistent with the policies underlying the IM-8310-2 and the terms and conditions applicable to the Program, we are not able to offer any additional or enhanced access."

41. In December 2002, SIEDLE hired a programmer who created a program whereby SIEDLE could download the information contained on NASD's website. In Februrary 2002, SIEDLE's programmer downloaded the pertinent information consistent with the terms and conditions of the PDP.

42. On February 5, 2002, Pullano, Ms. Anne Bushey ("Bushey") and another individual from NASD initiated a telephone conference with SIEDLE when they noticed that SIEDLE, through his hired programmer, had downloaded all of the CRD information from NASD website. They mentioned to SIEDLE that NASD had concerns about his plans to publish the data upon completing *The Siedle Directory*.

43. SIEDLE reiterated his intended use of the data and informed them that if they had any objections that they should inform him immediately as he was involved in final contractual negotiations with a publisher concerning publication of *The Siedle Directory*.

44. On February 22, 2002, Pullano faxed a letter to SIEDLE informing him that NASD had "concerns" with SIEDLE's proposed uses of the PDP data and that it had not "in any way authorized" SIEDLE to use the data for *The Siedle Directory* or any other commercial purpose. Pullano also stated that "NASD will pursue all legal remedies available to it."

45.     Pullano also stated that NASD was reviewing SIEDLE's "method of accessing, compiling and using" the PDP data to determine whether these actions had been undertaken "consistent with the terms and conditions" of the "subscription agreement" and the "policies under Interpretive Material 8310-2."

46.     Shortly after this letter was written, NASD revised their click agreement (the Second Click Agreement) in an effort to block SIEDLE's publication of *The Siedle Directory*. NASD has not expressed a concern with SIEDLE's method of accessing the information.

47.     SIEDLE informed the two publishers that he was engaged in negotiations with of NASD's positions concerning publication of *The Siedle Directory* at which point both publishers discontinued negotiations.

48.     SIEDLE thereafter has undertaken to publish *The Siedle Directory* himself.

49.     SIEDLE is being damaged, and the public is being damaged, by NASD's unwarranted, unfair and improper attempts to prohibit SIEDLE from accessing public CRD information from NASD's website in publishing *The Siedle Directory*.

50.     NASD's actions are in contravention of its mandate and the policy of public disclosure, the public is being harmed because NASD is attempting to unreasonably restrict its access to disciplinary information.

51.     Moreover, NASD's actions may result in a chilling effect on others seeking to prepare similar directories or otherwise use this information.

### Count I

(Declaratory Judgment:  Use of Information Already

Obtained From NASD's Website Under The First Click Agreement)

52.     SIEDLE realleges paragraphs 1 through 51, above.

53. An actual controversy exists between SIEDLE and NASD concerning the rights and obligations of the parties with respect to the public CRD information obtained from NASD's website under the First Click Agreement.

54. SIEDLE is in doubt as to his rights and obligations regarding the public CRD information obtained from NASD's website under the First Click Agreement.

55. The Court should declare that SIEDLE is entitled to publish *The Siedle Directory* without interference from NASD.

WHEREFORE, SIEDLE demands that this Court declare SIEDLE is entitled to publish *The Siedle Directory* without interference from NASD, and provide such other relief the Court may deem just and proper.

## Count II

### (Declaratory Judgment: Access and Use Of Information Prospectively Obtained From NASD's Website)

56. SIEDLE realleges paragraphs 1 through 55, above.

57. An actual controversy exists between SIEDLE and NASD concerning the rights and obligations of the parties with respect to the access of public CRD information and use of such information to be prospectively obtained from NASD's website by SIEDLE and as to which NASD asserts the Second Click Agreement.

58. SIEDLE is in doubt as to his rights and obligations regarding the access of public CRD information and use of such information to be prospectively obtained from NASD's website by SIEDLE and as to which NASD asserts the Second Click Agreement.

59.     The Court should declare that SIEDLE is entitled to access NASD's website and publish *The Siedle Directory* without interference from NASD.

WHEREFORE, SIEDLE demands that the Court declare that SIEDLE is entitled to access NASD's website and publish *The Siedle Directory* without interference from NASD, and provide such other relief the Court may deem just and proper.

## Count III

### Temporary Injunctive Relief

60.     SIEDLE realleges paragraphs 1 through 59, above.

61.     Because of the above, SIEDLE is without an adequate remedy at law.

62.     SIEDLE has a substantial likelihood of prevailing on the merits of Counts I and II.

63.     Due to NASD's refusal to release information, SIEDLE will suffer irreparable injury. SIEDLE has no adequate remedy at law in absence of injunctive relief, to which he has a clear legal right.

WHEREFORE, SIEDLE demands that the Court temporarily enjoin NASD from interfering with SIEDLE obtaining public information from NASD and publishing *The Siedle Directory* and provide such other relief the Court may deem just and proper.

## Count IV

### Permanent Injunctive Relief

64.     SIEDLE realleges paragraphs 1 through 59, above.

65.     Because of the above, SIEDLE is without an adequate remedy at law.

66.     SIEDLE has a substantial likelihood of prevailing on the merits of Counts I and II.

67.     Due to NASD's refusal to release information, SIEDLE will suffer irreparable injury. SIEDLE has no adequate remedy at law in absence of injunctive relief, to which he has a clear legal right.

WHEREFORE, SIEDLE demands that the Court permanently enjoin NASD from interfering with SIEDLE obtaining public information from NASD and publishing *The Siedle Directory* and provide such other relief the Court may deem just and proper.

## JURY DEMAND

SIEDLE demands a trial by jury on all issues so triable in the Complaint and Demand for Jury Trial.

BALES & WEINSTEIN

_____
John Calhoun Bales
Florida Bar No. 346985
Craig P. Clendinen
Florida Bar No. 0599761
P.O. Box 172179
Tampa, Florida 33672-0179
Telephone: (813) 224-9100
Telefacsimile: (813) 224-9109
Attorneys for SIEDLE

# THE
# SIEDLE
# DIRECTORY
# OF
# SECURITIES
# DEALERS

FIRST EDITION
SUMMER 2002

ATTACHMENT: *A*

PAGE *1* OF *53*


We make no warranty of any kind, and disclaim liability to any person for any actions taken or omitted with respect to this Directory. We are not responsible for and cannot verify information from any sources and we do not warrant or guarantee the accuracy or completeness of the information included herein. We shall not be liable for any cause of action in contract, tort, or otherwise, for more than the cost of the Directory. Notwithstanding the above, we shall not be liable for any loss of income, trading loss, or consequential, incidental, or indirect or punitive damages, regardless of whether we have been informed of the possibility of such damages.

Introductory Material Copyright © 2002 by Edward A. H. Siedle, Esq.

ATTACHMENT: *A*

PAGE 2 OF 53

# Table of Contents

Introduction..................................................................................................iv

Part I: Origin of the Directory and NASD Opposition to its Publication............viii

Part II: The Curious Phenomena of Self-Regulation....................................xiii

Part III: An Overview of the Industry.......................................................xv
   A. Types of Brokerages
   B. Conflicts of Interest
   C. Firm Definition and Registration Requirement
   D. Registration of Brokers
   E. State Registration and Regulation
   F. Fingerprinting
   G. Financial Requirements
   H. Financial Statements
   I. Securities Investor Protection Corporation: Self- Insurance for the Brokerage
      Industry
   J. Mandatory Arbitration: Self-Adjudication for the Brokerage Industry
      1. Public Investors Arbitration Bar Association

Part IV: Sources of Information Regarding Brokers and Brokerages.............xxix

   B. State Securities Regulators
      1. North American State Securities Administrators Association
   C. U. S. Securities and Exchange Commission
   D. National Association of Securities Dealers Public Disclosure Program
      1. The PDP "Big Firm Exception"
      2. Other Exceptions to the PDP
      3. "Expungement"
   E. Initial Analysis of PDP Industry Data

Part V: Conclusion.......................................................................................xlvi

About the Author.........................................................................................xlviii

Exhibits


ATTACHMENT: _A_
PAGE _3_ OF _53_

iii

**Introduction**

The Siedle Directory of Securities Dealers provides retail and institutional investors alike with critical information regarding the integrity of all brokerage firms registered with the National Association of Securities Dealers, Inc. (NASD). We believe the information provided in the Directory will assist investors in their determination whether to conduct or continue to conduct business with a NASD member firm. For the general public, a review of brokerage firms prior to investing and on an ongoing basis makes sound financial sense. For fiduciaries involved in brokerage decision-making, such as money managers, pensions, endowments and foundations, regular review of the brokerages they entrust with assets is mandatory.

As of December 2001, there are were approximately 5636 NASD member firms operating in the U.S. with over 88,000 branch offices and 673,822 licensed brokers. Like banks in the past, today it is brokerage firms that are primarily responsible for handling the nation's wealth. Yet there is a dearth of information regarding these firms.

The brokerage industry is unique in that it has been permitted to self-regulate with limited SEC oversight, self-insure through the Securities Investor Protection Corporation, self-adjudicate through mandatory NASD Dispute Resolution arbitration, and even control, through the NASD Public Disclosure Program, the information the public receives about firms. The degree of control the NASD and its members have over the investing public is both remarkable and disturbing.

information about NASD member brokerage firms. The Directory provides investors with important data regarding certain criminal charges and convictions, regulatory actions, civil judicial actions, and certain financial actions, such as bankruptcies, unsatisfied judgments or liens. By providing this and other information pertaining to all NASD member firms in a single place, available for simultaneous viewing, investors are able to compare and contrast firms, as well as garner information about the industry generally.

The Directory can be helpful to investors by providing them with industry-wide and firm specific data. For example, what percent of firms have disciplinary events in their histories? What is the average number of disciplinary events in each category? What are the types of products and services offered by a given firm? Does a firm frequently land in arbitration regarding a specific product or practice? In how many states is the firm registered to do business? Has the firm been suspended or expelled from the NASD? These are but a few of the questions the Directory will address.

Most important, the Directory can give investors a better understanding as to the disclosure process related to brokerages, including which matters are required to be

iv



ATTACHMENT _A_

PAGE _4_ OF _53_

disclosed and which are not and the integrity of the process. The Directory draws specific attention to matters that are required to be disclosed by firms, but often are not. Comparison can be made between the total number of arbitration cases and estimated number of customer complaints related to all brokerages over time and the total number of arbitrations and complaints that have ever been disclosed to the public by the industry. An explanation of the alternative sources of information regarding brokerages, including the Central Registration Depository, the U.S. Securities and Exchange Commission, state securities regulators and the NASD's Public Disclosure Program, accompanied by an analysis of the strengths and weaknesses of each, is provided. Subsequent editions of the Directory may enable investors to determine how significantly the information in the NASD's Public Disclosure Program (PDP) changes from year to year. If the information hardly changes, this may suggest that very little of what transpires in the industry is actually being disclosed. In summary, the Directory will enable investors to determine whether the sources of public information regarding the nation's brokerages are adequate and whether regulators and self-regulators are doing an effective job of protecting investors.

Investors should be aware that the majority of the publicly available information regarding brokers and firms has been prepared by the brokers and firms themselves via Forms U-4, U-5 and BD. Thus, brokers and firms may exercise discretion as to whether and when they disclose information to the public and how they characterize the disciplinary matters they disclose. Some firms are more skilled at avoiding embarrassing disclosures than others. For example, by settling or obtaining "expungement" of customer disputes nondisclosure is assured. Finally, given the current regulatory environment, investors should not readily assume they have information regarding all the disciplinary matters related to a firm. As will be explained more fully later, there are simply far too many loopholes in the system at this time to permit investor confidence regarding firm disciplinary histories.

It is anticipated the Directory will be published at least annually. The Directory draws certain data from the NASD's PDP that is edited for inclusion in the Directory. Firms are presented alphabetically, four firms per page. The number of disciplinary events per firm is given by category in the printed pages that follow. An index of the firms precedes the disciplinary summaries. A compact disc or CD is included which provides a description of all the activity listed in the summary data in the print volume, except with respect to the five "big firm exception" firms discussed below. Unfortunately, we were unable to scan the hundreds of pages related to each of these firms into the database for this edition. We fully intend to cure that omission in future editions. With respect to the five firms, readers are referred to the PDP to request the data via ordinary mail.

In addition, we have provided an important overview of the brokerage industry and are committed to providing subscribers with analyses of data and trends in the brokerage industry on an ongoing basis. Your suggestions regarding meaningful analyses you would like to see are appreciated.



The information in the Directory is not the only resource you should consult. For certain more up-to-date information concerning a given firm, you should access the toll-free Public Disclosure Program hotline operated by NASD Regulation at (800) 289-9999 or visit the NASD Regulation web site at nasdr.com. Note that there may be delays in the NASD's receipt and processing of the disclosure information the NASD receives from member firms, government agencies and other sources. According to the NASD, information submitted on current filings about NASD member firms requires approximately ten business days of processing by the NASD before it can be viewed on the NASD Regulation website or provided on a Public Disclosure Program report. (And the information may not be promptly reported to the NASD by the firms.) The NASD does not charge for the Public Disclosure Program information at this time, although it is permitted by law to charge persons, other than individual investors, reasonable fees for responses to inquiries. You should also seek to supplement this NASD information by learning as much as possible from other sources, such as the state securities regulators. The state regulators often provide more complete information. We further suggest you research firms through the Internet and news sources. Asking for references can be helpful. However, firm references or referrals from friends or family with established investment business relationships with the firm should not be unduly relied upon.

Interpretation of the data regarding firms should be undertaken carefully. The Directory lists the *number* of disciplinary and other actions related to a firm. However, numbers alone do not tell the whole story. Some disciplinary actions are of greater significance than others. Thus, firms with the same number of regulatory actions may be radically different. Also firms with longer operating histories and greater numbers of brokers in their employ may have lengthier disciplinary records than newer firms with few brokers. Firms that deal with the general public may be subject to more arbitration cases than institutional firms. It may be advisable to consult the narrative summaries of the

Most importantly, readers should be aware that the Directory provides information regarding brokerage *firms* only. While brokerage firms are responsible for supervising brokers, the individual brokers employed by the firms have their own disciplinary histories that should be reviewed. After all, it is the broker, not the firm that will have primary responsibility for handling your assets. Furthermore, even the best firms may make mistakes in hiring brokers from time to time. Diligently researching the firms and individuals you entrust with your assets is not easy, but failure to do so can have disastrous consequences.

In light of some of the publicity related to the publication of this Directory, particularly opposition by the NASD, it seems necessary at the outset to disclose to the reader certain of the author's underlying beliefs regarding investing in the stock market and doing business with brokerages. This is not a "tell all" book intended to discourage the public from investing with brokerage firms. To the contrary, the author believes investing in the stock market is intellectually stimulating and challenging, not to mention potentially rewarding financially. That is not to say that investing in the stock market is for everyone.

vi



Brokerages are the financial institutions that offer investors access to the financial markets. If you're going to invest, you will probably end up doing business with a securities firm. Many individuals in the brokerage industry are ethical and law-abiding and their firms' disciplinary histories reflect this. However, in any industry that involves handling significant monies belonging to others and being compensated on the basis of commissions, the temptation to steal or misuse such funds is great. It has been said that integrity can be judged by what someone does when no one is looking. As we have seen time and again, a single dishonest employee can ruin even a substantial, reputable, longstanding firm. On the other hand, we have also seen "boiler room" brokerages where all employees are involved in a purely criminal enterprise.

There are unquestionably many people in the brokerage industry who are not honest. Many have succumbed to the temptation to treat other people's money as their own and many more will in the future. The brokerage community, regulators and most so-called financial experts have responded to the issue of wrongdoing in the industry by supporting limited public access to data regarding the volume and frequency of offenses and by issuing unsubstantiated reassurances. As shocking as it may seem, there are many who believe "investor confidence" is the primary objective, not compliance with the law and full disclosure. That is, they believe it is more important for investors to have confidence in the system than be fully advised of the risks. The attitude seems to be that to draw attention to the prevalence of wrongdoing is irresponsible. Those who point to the lawlessness are considered less than credible. Yet "insiders" representing powerful financial institutions that trumpet the merits of the system are deemed to possess authoritative opinions. Their opinions are considered as rock-solid as the institutions they represent.

In the author's opinion, the greatest disservice to the American public is to lull investors into a false sense of security. To place investor confidence before the truth is to put the cart before the horse. Through full and fair disclosure, investors will learn who can and cannot be trusted. Incomplete or misleading assurances result in real harm to investors. Legislators, regulators and law enforcement officials need to be constantly reminded that people actually do lose their hard-earned savings everyday to disreputable forces in the marketplace. A growing sense of dissatisfaction with the system benefits no one. Whether we wish to admit it or not, investing in the stock market is a form of gambling. There will always be winners and losers. Our objective should be that even the losers walk away feeling they were adequately informed and fairly treated.

Perhaps it is time we retreat from the current generally accepted belief that participation by all in the financial markets should be urged, perhaps even with appeals to patriotism.

Today we are at a unique crossroads where control over data is increasingly shifting from government, regulators, law enforcement and self-regulatory associations to the public. The ability to conceal important information from the public, information the public wants to know, is waning. Due to the complexity of wrongdoing in the financial markets, these white-collar crimes and misdeeds are least likely to be reported and are rarely punished. Hopefully, this Directory by establishing a central reference source for



information about the brokerage industry will contribute to the public's understanding of the industry and draw attention to the abuses. Our ultimate goal is to encourage *responsible* public participation in the financial markets, even as we draw attention to the risks.

## Part I: Origin of the Directory and NASD Opposition to its Publication

"It (the NASD) has successfully resisted many proposals inimical to the best interests of the securities businesses at large as well as to its members."

> History of the NASD, nasd.com website

My job is to investigate illegal and unethical conduct by pension funds, money managers and brokerage firms. My qualifications to provide this service include having formerly served as an Attorney Advisor in Finance with the United States Securities and Exchange Commission and as the Director of Compliance and Associate Counsel to one of the largest international money managers. For over a decade, I have also owned brokerage firms that are members in good standing of the National Association of Securities Dealers, Inc. I hold every license required to operate a brokerage, including the general securities representative, general securities principal and financial and operations principal. In summary, I possess regulatory, corporate and entrepreneurial experience in the field. I refer to my background here because to ferret out wrongdoing, one must know the spirit and literal requirements of the law, understand how large financial institutions operate, including how they conceal their misdeeds, and be keenly aware of the myriad ways in which individuals and firms may be compensated.

Over the course of my career I have conducted hundreds of investigations, virtually all on behalf of institutional clients. Some cases were referred to regulators and law enforcement. A few cases have received public attention, the vast majority have not. From my experience I have learned wrongdoing in the money management and securities industry is far more pervasive than the public is aware. This lack of public awareness is no accident. Pensions, money managers, securities dealers and their regulators have all contributed to concealing the problems. There has been no conspiracy; rather, it is simply in no one's interest (except public investors) that violators be exposed. Once misdeeds have been uncovered and the perpetrator suitably convinced the victim is both knowledgeable and prepared to go forward with a complaint, the parties generally agree to a confidential settlement. Public confidence in "the system" is preserved by this secrecy. The unfortunate consequence of this method of operating is that the public remains vulnerable to known but concealed risks and each new victim must seek recompense without the benefit of any precedent. Only those with substantial resources find some degree of justice.

Brokerage firms often are in the midst of wrongdoing because they serve as the lynch-pin between pensions, money managers, pension consultants and securities trading. Virtually every time money moves, whenever money managers or securities in a portfolio turnover, a brokerage facilitates the transactions and gets paid a commission. While massive

studies regarding money managers have been published, little attention has been paid to brokerages. It is as if brokerages are regarded as unworthy of serious attention.

While conducting an investigation last year, it occurred to me that there was no comprehensive source for researching securities dealers. Rather than continue to conduct private investigations of brokerages on behalf of institutional clients who pay thousands of dollars in fees for research on a limited number of brokerages, I proposed to publish a Directory that would provide investors with valuable information regarding *all* the firms. Given my regulatory and legal background, I chose to begin the task by contacting the appropriate regulatory and self-regulatory organizations. The most expeditious route seemed to be to advise them of my project and enlist their support. After all, the goal of the Directory was investor education, the supposed mission of these organizations.

On July 20, 2001, I wrote to Ms. R. Clarke Hooper of the NASD's Office of Disclosure and Investor Protection and to Ms. Annette Nazareth, Director of the SEC's Division of Market Regulation. In that letter, I outlined my proposal to create The Siedle Directory of Securities Dealers which would provide the following information:

- a list of the regulatory history of all NASD member firms, as disclosed on the NASD Regulation Public Disclosure Program;
- a list by town or city of all NASD member firms; and
- a possible rating system which would consist of my opinion regarding each firm.

The primary purpose of my letter was to request the data I needed from the Public Disclosure Program in a format that would enable me to review it readily, as opposed to requiring me to download the information firm-by-firm.

Ms. Nazareth of the SEC never returned any of my phone calls or responded to my letter. When two members of her staff did call, they questioned why I was writing to the SEC since the Public Disclosure Program was administered by the NASD, not the SEC. I reminded them that under Section 15 of the Securities Exchange Act, the NASD was required to make the disciplinary history of its membership publicly available and the SEC had oversight authority regarding whether the NASD was complying with its statutory duties. Thus, the SEC had a very real role to play in determining whether the NASD should grant me access to the public disclosure data. Presumably, if it was in the public interest, it seemed reasonable to believe the SEC would suggest to the NASD that the Association cooperate with my project.

Chief Counsel and Director of CRD/Public Disclosure at the NASD, Richard Pullano, responded to my July, 2001 letter with a telephone call to me on or about August 27, 2001, during which we discussed the Directory. I mentioned that I did not need to access the data through the Public Disclosure Program website if the NASD would provide the data in an alternative form. Additionally, I informed the NASD of my ability to access the data through a hired programmer or secretarial pool via the website. Mr. Pullano indicated no preference as to the method I would employ in obtaining data via the website, but indicated orally he did not believe that the NASD would provide me with



*enhanced* access. That is, I probably would not be given the information on a compact disc, ready for use.

On that same day I wrote to Mr. Pullano stating that I believed that The Siedle Directory would supplement, and not replace, the Public Disclosure Program. I listed several advantages to The Siedle Directory, all of which would serve the NASD's stated goal of benefiting and protecting the public, including:
- affords unlimited number of inquiries compared to the limited current system;
- permits the reader to simultaneously compare one firm's disciplinary records against another; and
- provides the reader with an overview of industry norms.

On October 2, 2001, Mr. Pullano responded to my letters of August 1, 2001 and August 27, 2001 by reiterating his understanding of The Siedle Directory. Mr. Pullano affirmed that "while we do not object to your accessing the Public Disclosure Program consistent with the policies underlying the IM-8310-2 and the terms and conditions applicable to the Program, we are not able to offer any additional or enhanced access." Mr. Pullano's letter indicated that he sent a copy to Ms. Annette Nazareth of the SEC.

Based upon Mr. Pullano's October 2nd letter indicating that the NASD did not object to my proposal, I retained a computer consultant to download the data from the Public Disclosure Program in December 2001 and January 2002. In January 2002 I retained an attorney to negotiate with two publishers that were interested in the Directory. Each of these publishers was given Mr. Pullano's letter; each indicated they saw no reason to seek any further approval from the NASD.

NASD initiated a telephone conference with me when they noticed that I, through my hired programmer, had downloaded all of the Public Disclosure Program information from the NASD website. They mentioned to me that the NASD had concerns about my plans to publish the data upon completing The Siedle Directory. I reiterated my intended use of the data and informed them that if they had any objections that they should inform me immediately as I was involved in final contractual negotiations with a publisher concerning publication of The Siedle Directory.

Three weeks later, at 10:00 p.m. on Friday, February 22, 2002, Mr. Pullano faxed a letter to me informing me that the NASD had "concerns" with my proposed uses of the PDP data and that it had not "in any way authorized" me to use the data for The Siedle Directory or any other commercial purpose. This was the first time anyone at the NASD had indicated that the NASD believed it could prohibit commercial use of the data. Mr. Pullano also stated that the NASD was reviewing my "method of accessing, compiling and using" the PDP data to determine whether these actions had been undertaken "consistent with the terms and conditions" of the "subscription agreement" and the "policies under Interpretive Material 8310-2." The NASD at its website has a "click agreement" with respect to the use of information obtained from the website. Notably, I

had hired a computer programmer to legally access the site and obtain the PDP information.

The letter closed by reiterating that I was not authorized to use the PDP for The Siedle Directory and that the NASD would pursue "all legal remedies available to it" should I attempt to publish the Directory. Unlike his earlier letter, Mr. Pullano apparently did not send a copy of this threatening letter to Ms. Annette Nazareth of the SEC. I faxed to the two publishers who were interested in publishing the Directory the letter Mr. Pullano had faxed to me. Both publishers responded that while they were still very much interested in publishing the Directory, they would not proceed until the matter of the NASD's threatened litigation had been resolved.

On February 28, 2002, my counsel, Richard M. Gelb, wrote to Mr. Pullano explaining that the data contained in the CRD was not copyrightable and that any "click agreement" should not be enforced.

On March 1, 2002, my counsel and I had a telephone conference to discuss the issues raised in Mr. Pullano's February 22, 2002 letter with Derrick Linden, Senior Vice President Of Public Disclosure and Terri Reicher, Esquire, NASD's Associate General Counsel. They informed me that I was bound by the terms and conditions of the website not to use the information for commercial purposes. My counsel informed them that a repository of otherwise public data is not copyrightable and that the terms and conditions of the NASD's "click agreement" were not enforceable against me. He also informed them that even if the "click agreement" restricted use to non-commercial purposes as the NASD maintained, I was not prevented from publishing the information for a non-commercial purpose (i.e. for free). As discussed below, the "click agreement" was subsequently modified to attempt to close what the NASD perceived during our

A plain reading of the old click agreement did not prohibit the commercial use of the information. Under the PDP terms and conditions information provided through the PDP can be used only as follows:

> "a. to assist in determining whether to conduct or continue to conduct securities or commodities business with NASD Member Firms or Associated Persons;
> b. in judicial proceedings or arbitration proceedings related to securities or commodities transactions, or
> c. for other non-commercial purposes consistent with the promotion of just and equitable principles of trade and the protection of investors and the public interest." (emphasis supplied)

Contrary to the NASD's position, the PDP terms and conditions did not prohibit commercial use of the information for purposes (a) and (b). Indeed, subparagraph (c) does not modify (a) and (b) at all because of the use of the disjunctive "or." Therefore, I maintained that to the extent I wished to use the information in The Siedle Directory for



purposes (a) and (b), there was no agreement with the NASD preventing me from so doing.

During the above-mentioned conference, the NASD informed my counsel and me that it intended to revise the "click agreement." We questioned whether the NASD had the authority under the federal securities laws to unilaterally change the terms and conditions under which the public could access information about brokerages through the PDP without the advice and consent of Congress and the SEC, since it was Congress and the SEC that had required the NASD to establish the PDP. On or about March 12, 2002, the NASD informed my counsel that the "click agreement" had been revised. The new "click agreement" which appears on the NASD's website today is far more restrictive than the original. It prohibits anyone from accumulating information about more than a few firms for any purpose. Any excessive or repetitive requests for information is prohibited. A taped message has also been added to the Public Disclosure Program's telephone hotline indicating that telephone requests for information are governed by the website "click agreement." (A copy of the old and new "click agreements" is provided in the Exhibits section.)

On the conference call, the NASD also stated that I was "data mining". This is simply incorrect as I am not attempting to use confidential information compiled by the NASD, but rather I am attempting to use public information that is merely deposited with the NASD by the SEC and other regulatory organizations. Moreover, to the extent the NASD was concerned about misuse of information, I informed the NASD that I was willing to provide assurances of proper use of the data. Additionally, my counsel informed the NASD that my vast experience as a former attorney for the SEC and my experience in the securities industry coupled with a reputable publisher should be an indicator of my intended proper use of the information.

At approximately the same time, a summary of the NASD's actions was sent via e-mail to all of the state securities regulators and the staff of the North American Securities Administrators Association. No response to these e-mails has been received, although in private conversations I initiated to several of these individuals, all agreed the data in question is public information and publication of the Directory is consistent with the states' objective of enhanced disclosure to investors.

On March 13, 2002, my counsel sent a letter to Harvey Pitt, Chairman of the SEC, regarding the NASD's attempts to thwart publication of the Directory. A copy of the April 12th letter my counsel received from the SEC's Division of Market Regulation in response to his letter is provided in the Exhibits section. In summary, despite the significant investor protection issues involved, the SEC deferred the matter to the NASD.

In conclusion, The Siedle Directory of Securities Dealers is published today under a threat of litigation issued by an association of brokerage firms federal and state regulators have permitted to regulate the brokerage industry.



**Part II: The Curious Phenomena of Self-Regulation**

"…it may be said that the idea of self regulation is just a device to avoid regulation….."
John Dickerson, Asst. Secretary of Commerce 1934

Securities dealers, commonly referred to as stockbrokerages or "broker-dealers" under the securities laws, play a crucial role in America. These financial institutions can be found from Wall Street to the Main Streets of every city in the country, offering their investment products and services to the public. Investors today, both retail and institutional, are likely to entrust a significant portion of their assets to brokerages. Investors may maintain a bank checking account for their short-term cash needs and bill paying; however, increasingly any substantial wealth they may have accumulated is invested with a securities dealer. Yet information about specific brokerage firms and the brokerage industry in general is extremely difficult to obtain.

The lack of public awareness of the brokerage industry is no mere coincidence. Ironically, this industry which is responsible for handling so much of the nation's wealth has been allowed to regulate itself to a large degree since the federal securities laws were enacted in the 1930s. A consequence of self-regulation is that the industry has a great deal of control over the information the public receives about it. And there are very real limitations upon how much attention the brokerage industry wants drawn to its weaknesses.

The self-regulatory organization that governs the securities industry is the National Association of Securities Dealers, Inc, or the NASD. According to its Manual, "The NASD, which operates subject to Securities and Exchange Commission oversight, is the largest self-regulatory organization in the United States with membership including virtually every brokerage in the nation that does business with the public." In its Manual, the NASD describes the origins of its self-regulation and concludes with the following statement: "Thus, the NASD is not an organization that was imposed upon the investment banking and securities business by Congress or by the Securities and Exchange Commission. The privilege of self-regulation was actively sought by the securities business; and the success the organization has achieved is attributable in large measure to the countless hours of work devoted to the Association by many people in the securities industry." Presumably any industry, given the choice between self regulation and regulation by the government, would choose self-regulation. The question the Manual does not answer is *why* the securities industry was permitted the self-regulation it "actively sought" in the 1930s and has been allowed to self-regulate ever since. Other financial institutions, such as banks, insurance companies and money managers are subject to government regulation. Are brokerages especially trustworthy and deserving of self-regulation?

What does it mean to say that the NASD operates subject to SEC oversight? What is government-supervised self-regulation? In practical terms, it means that the NASD is responsible for day-to-day matters involving brokerages and the investing public,

ATTACHMENT: *A*

PAGE *13* OF *53*



provided the Association properly exercises its responsibilities. The SEC has broad power to force the NASD to take action when the Association fails to do its duty. The history of self-regulation of brokerages is full of mishaps. In the late 1960s, forty years after the original scheme was created, it fell apart. At that time the brokerage industry went through a crisis similar to the Great Depression and SEC authority over the industry was expanded.

In more recent times, in August 1996, the SEC conducted an investigation into the operations and activities of the NASD and of the market making activities of the NASDAQ Stock Market. The investigation uncovered fundamental concerns regarding the operations and structure of the NASD and the NASDAQ. The SEC found deficiencies in the NASD's oversight of the NASDAQ market and found the NASD had failed to enforce compliance with NASD rules and the requirements of the federal securities laws. The SEC found the NASD had violated certain provisions of the Securities Exchange Act of 1934 by failing to adequately comply with certain NASD rules and to enforce compliance with the Exchange Act and its rules. The 1996 Report discussed the history of self-regulation of the brokerage industry and referred to "the inherent potential for self-regulation to favor the interests of the securities industry over those of the investing public."

The SEC action resulted in an unprecedented restructuring of the NASD, a major feature of which was to separate the regulation of brokerages from the operation of The Nasdaq Stock Market. NASD Regulation, Inc. (NASDR) was established as a separate, independent subsidiary of the NASD. The mission of the new subsidiary was "to regulate securities markets for the ultimate benefit and protection of the investor. In carrying out this mission, NASDR assumed a substantial portion of the parent organization's responsibilities of being the securities industry's primary self-regulator."

Despite such rhetoric, investors should always bear in mind that the primary mission of the NASD and its subsidiaries is not the protection of investors but rather the furtherance of its membership's business interests. Self-regulation creates a classic conflict of interest situation. Indeed, if self-regulation worked well, there would be no need for regulatory agencies. The NASD, an association whose members are all brokerage firms, is charged with primary responsibility for enforcement of laws intended to protect investors from harm caused by its members. The outcome of the "balancing of interests" that self-regulation produces is likely to be an environment where enforcement of the letter and spirit of the law occurs to the extent required to maintain public confidence in the industry, but not so far as to cause widespread dissent among the membership.

Due to the conflict of interest that is inherent in self-regulation, it is prudent for investors to maintain a degree of skepticism in dealing with the NASD and its subsidiaries. Again, the NASD is not a government regulatory agency and it is not an investor advocacy organization. It may function in ways that mimic such entities but the distinctions between a self-regulatory organization and a government agency or advocacy organization are significant.

Dealings with brokerages and other financial institutions are unique in that significant wealth is transferred from its owner(s) to another as caretaker or fiduciary. Serious harm can result if the broker or firm breaches its duties. The risks related to the decision regarding which broker and firm to trust are great. You can literally lose everything if you choose poorly. Thanks to the power of "margin" or the ability to borrow from brokerages, you can conceivably lose more than all the money you have. It is well worth your time to carefully consider the firm(s) you choose to do business with and learn as much as possible about industry practices before investing. Remember: it is far easier to lose money with a brokerage firm than it was for you to acquire or earn it.

## Part III: An Overview of the Industry

Perhaps a good place to start in becoming informed of the risks related to dealing with brokerages is with an overview of the business. Our overview will not be limited to the relevant regulations, licensing and capital requirements but will include business practices and realities. To simply detail the extensive regulatory framework may result in investors believing that the risks related to doing business with brokerages are limited or contained. No regulation of any industry has ever succeeded in eliminating all the risks. And, as comprehensive as it may seem, the regulation of brokerages has its weaknesses.

Brokerages are subject to an intense scheme of regulation including federal and state laws and regulations, rules adopted by self-regulatory organizations, federal and state administrative agency actions, and federal and state common law. These regulations impose certain duties upon brokerages, prohibit firms from certain activities, establish surveillance mechanisms, require disclosures, as well as establish reporting, financial responsibility and record-keeping obligations. Sanctions exist for firms and individuals that fail to carry out their regulatory obligations. The regulatory system also provides for

impressive as the regulatory scheme may appear, it is hardly toolproof.

Brokerages may perform a variety of functions including buying and selling stocks, bonds and other securities for customers, underwriting public offerings of companies' stocks, providing investment advice, extending credit or "margin" to customers, and taking custody of or safekeeping customer securities.

## A. Types of Brokerages

There are many types of brokerages, including small specialty or boutique firms and large full service firms (also known as "wirehouses") with extensive national and international branch networks. Some firms offer a wide array of products and services to the general public. Other firms may offer only a single product to a select number of wealthy or institutional clients and not be licensed to do business with the public. Furthermore, nothing in the world of financial services is ever static. Brokerage firms frequently evolve over time. For example, they may start out as small, regional retail organizations and later grow or merge into a national firm with sufficient strength to attract large, institutional clients.

There are far more types of brokerages than the public is generally aware. There are brokerages that have no trading desks and others that have virtually no "employees." Some firms house broker-employees in company offices; other firms treat brokers as "independent contractors" and allow them to operate from remote offices of their own. "Independent contractor" firms are often criticized for lacking supervisory controls; nevertheless, they are increasingly commonplace. The diverse world of brokerages includes "soft dollar" and "commission recapture" firms, "minority" and "women-owned" firms, and publishing/research brokerages. Few realize that Standard & Poor's, a well-known publisher and the publisher of Investors Business Daily, both own large brokerage firms through which their many publications can be purchased with commission dollars.

Brokerages may also be owned or affiliated with banks, insurance companies, mutual fund organizations, money managers, pension consultants and other non-financial services companies. It is often important to identify the types of products and services a firm offers, as well as any related companies in order to understand a brokerage firm's business and any conflicts of interest the firm may be subject to.

## B. Conflicts of Interest

What do we mean by conflicts of interest within brokerage firms? These are situations where the customer may be disadvantaged when the brokerage puts its own interests ahead of its customers. Brokerage firm conflicts of interest may expose clients to very real harm. Investors should not readily accept assurances offered by firms that these conflicts are harmless or that firms have procedures in place to eliminate the dangers.

firms' interests are necessarily aligned with their own.

The most familiar conflict situation is "churning." Churning involves a firm excessively trading stocks in a customer's account in order to earn greater commissions for itself, as opposed to trading to enhance a customer's return. Firms have been said to preach to their brokers, "when you cease to churn, you cease to earn." Another well-publicized conflict of interest scenario is where a brokerage produces investment research regarding a company with which the firm has an investment banking relationship. While the firm may seek to assure investors that it has a "Chinese Wall," separating investment banking and research, and that its research is not tainted by the banking relationship, investors would be foolhardy to accept this explanation. We all know that people within companies talk to one another. It is human nature and financial professionals are no less human than the rest of us. If it is important to the investment banking division of the brokerage firm that a company's stock be well received in the marketplace, you can be certain that someone within that division will talk to someone in research. The result will be a favorable research report encouraging investors to buy the company's stock. The brokerage firm benefits on the banking side of its business, even as its customers lose money when the stock later tanks. This scenario may not happen all the time but it will



happen some of the time. Furthermore, it is well known that research analysts' compensation may include bonuses related to investment banking transactions.

However, there are countless other conflict of interest situations which may be harmful to brokerage firm customers, many of which are less well known. For example, firms may push mutual funds and other products onto their clients that pay the highest commissions to their brokers. And firms may benefit by recommending stocks to their customers that are held in firm proprietary trading accounts when the recommended stocks rise in price due to customer buying.

For every new development in financial services, there are new risks. The key to identifying conflicts of interest and protecting against them lies in understanding how brokers and firms are compensated. Often compensation schemes are complex and hidden from view. Compensation arrangements on Wall Street are frequently creatively modified, in an effort to increase sales. Customers of brokerage firms need to be continuously updating their knowledge of industry practices in order to guard against conflicts of interest.

## C. Firm Definition and Registration Requirement

An acceptable working definition of a securities brokerage is a firm that buys or sells securities, i.e., stocks or bonds, on behalf of public customers for a fee or commission. Generally, with a few notable exceptions, brokerage firms are required under federal and state securities laws to be registered with the Securities and Exchange Commission and state securities regulators. Registration with the SEC requires initially filing an application on a standardized Form BD and an accompanying financial statement. Form BD requires the disclosure of basic information about the firm's business, such as name,

which it is registered to do business. Form BD also requires the firm to disclose any previous violations of the securities laws by the firm or individuals associated with the firm.

Form BD does not require disclosure of customer complaints or arbitration cases against brokerage firms. (As discussed later, the failure to require disclosure of complaints and arbitrations on Form BD results in less access to such information regarding brokerage firms than is permitted with respect to individual brokers. This disparate treatment obviously benefits NASD member firms and it is not surprising that the NASD crafted Form BD to offer greater protection to its members than their employees.) Today the completed Form BD is filed with the Central Registration Depository and is electronically forwarded to the SEC for review.

While every firm's completed, most current Form BD is now available on-line through the NASD's WebCRD system for regulators, self-regulators and the firm itself to see, investors may not access WebCRD and rarely see Forms BD. Furthermore, firms are not required to provide them to customers. Form BD may not make for fascinating reading or provide startling insights into a firm's business or disciplinary history, nevertheless,

ATTACHMENT A

PAGE 17 OF 53

investors should review a firm's Form BD prior to engaging in business. Also, since these forms are regularly amended by firms to include new information, periodic requests for any amendments may be prudent.

Investors may obtain Form BD filings, which are publicly available, through the Public Reference Branch of the SEC's Office of Filings and Information Services. Guidance upon obtaining information from the Commission's Public Reference Room, including contact information and notes on operating rules and procedures, is available at sec.gov/info/edgar/prrrules.htm. The SEC charges for this service. As discussed later, Forms BD can also be obtained from state securities regulators at no cost.

Form ADV, the SEC form money managers are required to complete and provide to their clients were recently made available online at the SEC's website, while Forms BD for brokers are not available online and are not required to be delivered to customers. What is the explanation for this inconsistency? There are more money managers registered with the SEC than brokerages and Form ADV is comparable in length to Form BD. Thus, it would seem the operational issues related to making Forms BD available to the public are no more formidable than those encountered making Forms ADV for money managers public. Could it be that Form BD is not available to the public because brokerages are self-regulated and have resisted such disclosure whereas money managers are regulated by the SEC?

In addition to registration with the SEC, the federal securities laws require firms to become a member of a registered securities association. As a result of this legal requirement, almost all brokerages registered with the SEC are also registered with the NASD.

Every person associated with a brokerage firm who is involved in selling securities to the public must register with the NASD and the states in which he or she does business and be appropriately licensed.

The Form U-4 is used by representatives of brokerages to become registered with the states and the NASD. The Form requires individuals to indicate the licenses they possess, the states in which they will conduct business, as well as provide residential, employment and disciplinary information. Disciplinary information includes matters such as whether they have been charged with a felony or found to have been involved in a violation of an investment-related law. Individuals are required to update the information on their U-4s, as changes occur. Nevertheless, many brokers and firms neglect to promptly update such information when it is in their best interests. Form U-4 requires brokers to disclose certain customer complaints and settled arbitrations which brokerage firms are not required to disclose.

Form U-5 is used by a brokerage to terminate the registration of an individual with the firm. In brief, this Form requires the firm to report the reasons for the individual's

termination and whether the individual was involved in any wrongdoing while employed at the firm. There are several difficult issues related to Form U-5 filings by firms. The first concerns a brokerage firm's obligation to update or amend a former employee's U-5 to include consumer disputes and other matters that come to the firm's attention after the broker has moved onto another firm. In many cases, a firm may not be aware of broker wrongdoing until months after the broker's registration with the firm has been terminated. Many firms will neglect to amend a broker's U-5 after he has left the firm, even after they become aware of a problem. Amending the U-5 could potentially open the matter to unwelcome regulatory and public scrutiny. On the other hand, some firms file nasty U-5s to retaliate against brokers who have left, taking customers with them. Finally, it is clear that, under certain circumstances, firms may be held liable for defamation in connection with U-5 filings. Thus, the question of how revealing U-5 filings may be is open for debate.

Some of the information required on these Forms is publicly available for investors to review in selecting a broker through the NASD's Public Disclosure Program. Other information on the Forms is not disclosed to the public. The disclosures required on these Forms have changed over time, as have the items that are viewable by the public through the Public Disclosure Program. (The PDP was only established in 1988.)

The member firms of the NASD and their broker-employees are extremely concerned regarding what information about them is disclosed to the public. For example, should only "investment-related" misdemeanors have to be disclosed or all misdemeanors? It's a constant tug-of-war as the industry struggles with how much must be reported to the public to engender public confidence and how much can be kept private. Yet when a new broker scam hits the newspapers and it is uncovered that the brokers and firms involved had long histories of undisclosed violations, the public howls for greater disclosure and

not is too complex a topic to be addressed here. However, investors should keep in mind that the disclosures required on these forms, which are in turn subject to public scrutiny, likely will remain of concern to the member firms of the NASD. Expect to see regular revisiting of these forms and proposed modifications. This is a very real problem because every time a form is modified, the information no longer required is removed from public scrutiny through the NASD's PDP. In summary, industry "fiddling" with the forms adds yet another element of confusion to the various public disclosure systems.

There are no educational requirements for any position in the securities industry. To be licensed as a stockbroker or to perform supervisory duties at a brokerage does not require even a high school diploma. There are many different types of licenses that a broker may hold. The broadest license is the General Securities Representative (or Series 7), which allows the individual to sell all types of securities. There are more limited licenses for individuals involved solely in selling, for example, options or mutual funds.

Brokerage firms are required to establish supervisory "chains of command" to ensure that all brokers within a firm are in compliance with the applicable laws. Every broker must be accountable to a "principal" who is responsible for overseeing the broker's work. The

xix



General Securities Principal or Series 24 license is required for principals, in addition to the Series 7. Firms are generally required to have at least two General Securities Principals. Finally, every firm must have an individual who is responsible for ensuring that the firm is in compliance with the financial and operational rules. Series 27 is the license for Financial and Operations Principals. There are also continuing education requirements that individuals must meet as long as they are registered.

Every firm is required to have Written Supervisory Procedures in place to ensure supervision of employees, firm compliance with the law and continuing education. Employees are required to read and understand this compliance and supervisory manual. Firms are also required to identify in their Written Supervisory Procedures a Designated Supervisor or Chief Compliance Officer who is responsible for the firm's overall compliance.

While the "chain of command" concept sounds reasonable in that every individual and every important responsibility of brokerages is subject to supervisory review with accountability, the reality is far less reassuring. Compliance personnel within firms often are underpaid and lack significant power, yet they are charged with the responsibility for reining in the activities of often the most highly compensated individuals or "top producers." Should a compliance officer attempt to assert his authority in a confrontation with a top producer, it is the compliance officer, not the violator, who is likely to be looking for a new job. There are few safeguards to protect compliance officers from being wrongfully terminated for properly executing their duties. Further, since compliance personnel often are poorly paid, they are unlikely to have sufficient funds to bring a lawsuit. It has been observed that the compensation, credentials and corporate status of compliance personnel may be indicative of a firm's attitude toward compliance. If the compliance officer lacks legal training, is not well compensated and is low on the

profiteering than safeguarding compliance with the law.

On the other hand, a well-known strategy for firms experiencing outrageous compliance problems that threaten to destroy them is to hire a prominent securities lawyer, possibly a former regulator, as in-house counsel to demonstrate to regulators that they intend to comply with the letter of the law in the future. Of course, if firms took compliance seriously in the first place, they would not have to make these public showings of good faith. Unfortunately, the general rule is that compliance is not as high a priority at brokerage firms as it should be, especially when compliance inhibits profits.

**E. State Registration and Regulation**

In addition to regulation at the federal level, the brokerage industry is also regulated by the states. Every state has statutes, referred to as "blue sky laws," that apply to brokerages and brokers operating within its borders. The adoption of the Uniform Securities Act of 1956, in whole or in modified form, has made regulation by the 50 states far less chaotic for firms to comply with. Registration of brokers and firms with the states today can be accomplished through the NASD's Central Registration Depository. Every state has a

securities regulatory agency and a Director or Administrator responsible for monitoring brokers and firms operating within the state. In some states this agency is quite large, in others it may consist of only a few people. Frequently the agency is a subset of another state agency, such as the Department of Banking and Finance, for example.

State securities administrators generally are not civil servants and serve at the pleasure of the authority that appointed them. If the state government is controlled by individuals that favor deregulation, then the state securities administrator's attitude toward regulation will likely reflect that orientation or he'll soon be looking for a new job. Some states are far more aggressive than others in the manner in which they handle consumer protection matters and may be especially vigilant in protecting their citizenry from unscrupulous brokerages. Other states with high elderly populations may be especially concerned about brokers preying upon their elderly retirees, even if the consumer protection laws within the state are generally lacking. There are also regional issues that may cause a state regulator to be especially concerned about certain types of securities offerings. For example, states where oil and gas exploration offerings are commonplace may be especially vigilant in reviewing such offerings.

## F. Fingerprinting

As part of the disclosure process, the partners, directors, officers and employees of a brokerage involved in selling securities or handling cash are required to submit their fingerprints to the Attorney General of the United States. These fingerprint records are used to verify individual responses on Form U-4 regarding criminal matters. Disparities between U-4 responses and Department of Justice records are commonplace due to the ambiguities in the Form U-4, uncertainty on the part of individuals regarding whether past criminal incidents remain in their records, as well as the desire of certain individuals to conceal their criminal pasts.

## G. Financial Requirements

Brokerages are subject to rigorous net worth and capital requirements. Because of the unique nature of brokerages and their need to comply with NASD and SEC reporting and disclosure requirements, this field of accounting practice requires specialized skills. In fact, the American Institute of Certified Public Accountants has issued a handbook guide for brokerage accounting and auditing procedures.

Under the federal securities laws, brokerage firms must meet certain minimum financial solvency standards. The minimum financial solvency test is known as the Uniform Net Capital Rule. The Net Capital Rule has to be complied with at the time the brokerage comes into existence and at all times thereafter.

The computation of a brokerage's net capital is not all that different from other business accounting. The difference between the company's assets and liabilities is its net worth. Assets that are not liquid and unsecured are referred to as "non-allowable" assets and are



subtracted from net worth to arrive at liquid net worth. The Net Capital Rule takes liquid net worth or "tentative net capital" and does some further fine-tuning to arrive at net capital. One item of fine-tuning is known as "haircutting." Brokerages often carry securities in inventory. Since an inventory of securities is volatile, the value of these securities or assets is discounted or "haircut" to reflect the volatility. The final result is the net capital of the firm.

Due to fluctuations in brokerages' financials and human error, violations of the net capital requirements are not unusual. Serious net capital violations can result in a firm being temporarily or permanently prohibited from doing business with the public. However, in circumstances where the violation presents no real threat of harm to the public, the firm promptly notifies regulators of the matter, and the violation is quickly cured, little more is required than disclosure of the event. Repeated net capital violations suggest a firm lacks internal controls to monitor net capital and other compliance—an issue which should be of concern to customers of the firm.

Depending upon the nature and size of business a brokerage is involved in, the minimum net capital requirements differ. Minimum requirements can be as little as $5,000 for firms that essentially pass or "introduce" their business to another brokerage for processing, i.e., execution and settlement of customer trades. These are called "fully disclosed introducing brokerages." Firms that sell mutual fund or insurance products only may be subject to a $25,000 minimum. Firms that do their own processing, i.e., clearing and carrying of customer accounts, are referred to as "general securities clearing/carrying brokerages" and may be subject to a $250,000 minimum. Firms that engage in "market making" activities are subject to another net capital standard which can be as little as $100,000 or as much as $1,000,000. However, because the requirements of the Net Capital Rule fluctuate with the type and volume of business in which a firm is involved

maintain.

There are other important rules in the federal securities laws that require brokerages to protect the assets of their customers and stipulate that at no time can the assets of customers be used in any unauthorized, illegal or abusive manner. The regulations are intended to assure that at all times customer assets are protected from any abuse by the brokerage and that customers are protected against the brokerage becoming insolvent by compliance with the Net Capital Rule. As mentioned below, the Securities Investors Protection Corporation, known as SIPC, was created in 1970 to offer limited protection to investors in the event of a brokerage's bankruptcy.

Many investors, confusing brokerages with banking institutions, mistakenly believe that the amount of capital brokerages are required to maintain is far more substantial than indicated above. Investors also may equate SIPC coverage with FDIC coverage applicable to bank deposits. With respect to regulation, capital requirements and insurance, it is important that investors distinguish between brokerages and other financial institutions. Bank-affiliated brokerages perhaps create the most confusion regarding the differences between brokerages and other financial institutions.

## H. Financial Statements

Brokerages are required to file annually with the NASD and SEC financial statements audited by an independent public accountant. These audited financial statements are not publicly available and most firms are reluctant to hand them out. Review of the full audited financials is recommended for a complete due diligence of a firm. It seems counterintuitive to require firms to have audited financials prepared but not make them available to the public. In addition to the requirement that firms file audited financials with the NASD and SEC, brokerages are required to annually send to every customer an audited balance sheet and a footnote containing a statement of the firm's "net capital." An unaudited financial statement must be sent to every customer six months later. The limited financial information brokerages are required to provide investors are virtually useless for due diligence purposes and most customers simply throw them away.

Institutional investors, on the other hand, typically demand firms provide a completed Form BD, the most recent audited financial statements and interim financial information known as FOCUS filings.

## I. Securities Investor Protection Corporation: Self- Insurance for the Brokerage Industry

Virtually all brokerages are members of the Securities Investor Protection Corporation or SIPC. SIPC had its origins in the difficult years of 1968-1970 when high trading volumes coupled with very severe declines in stock prices caused hundred of brokerages to merge, be acquired or go out of business. Public confidence in the securities markets was shaken as brokerages were unable to meet their obligations to their customers and went bankrupt. SIPC is a non-profit, non-government, membership corporation, funded primarily by NASD member brokerages. According to SIPC, its primary role is to return funds and securities to customers if the brokerage holding these assets becomes insolvent. With over $1 billion in assets invested in government obligations and additional lines of credit with banks and the United States Treasury in the billions, SIPC looks an awful lot like a governmental organization, although it is not.

Until 1996, SIPC was funded through assessments upon NASD member firms based upon firms' gross revenues. Once the SIPC fund reached $1 billion in 1996, it was determined that sufficient funds had been set aside to deal with any potential liability. Since then NASD members have been simply assessed $150 per year. Thus, today SIPC's assets are annually added to at the rate of $150 x 5600 brokerages, or approximately $840,000, plus the interest earned on its government securities. This amount has apparently been more than adequate to fund its limited obligation to customers of insolvent brokerages because SIPC's assets have been growing, not shrinking, since 1996.

SIPC has its critics. The Public Investors Arbitration Bar Association's President in a 1999 press release stated, "It's time for American investors to learn the truth: the whole

ATTACHMENT _A_
PAGE 23 OF 53

notion of SIPC "protection" can be a cruel hoax. In spite of its $1 billion in reserves, SIPC is being run like a for-profit insurance company, doing everything in its power to deny claims rather than protect investor assets. If a claimant gets over one of SIPC's arbitrary hurdles, they create another to climb over, then another and another. It's time for Congress to shake up SIPC and get it back where it is suppose to be: on the side of the small investor."

The PIABA press release described the experience of 3,500 investors who sought SIPC relief after the notorious micro-cap stock firm Stratton Oakmont went bankrupt. The press release stated that according to SIPC data reviewed by PIABA, more than 22,000 former customers of the Stratton firm received notices of the bankruptcy and 3,368 responded with claims against the firm. Of those, only nine received cash or securities from SIPC totaling $393,896. By contrast, SIPC paid out $3.6 million in 1998 to outside attorneys to handle the denials of 99% of the claims filed by investors.

SIPC coverage applies to current (and in some cases former) SIPC member brokerages. SIPC's power to protect customers of former SIPC member ends 180 days after the member loses SEC registration. According to SIPC, the SEC normally does not terminate a brokerage's registration if the SEC knows that the firm owes securities or cash to customers. Therefore, SIPC suggests customers can best protect themselves and assist the SEC by reporting their losses promptly.

In general, SIPC coverage applies in two distinct types of situations. SIPC was created to return customer property when a "clearing firm" became insolvent. In the securities business, there are many cases where two separate brokerages work together to service a customer account. These firms are known as the "introducing firm" and the "clearing firm." The introducing firm typically employs the individual broker who takes the customer order and transmits it to the clearing firm for execution on an Exchange. The introducing firm is likely to be the only firm the customer has contact with. The clearing firm holds the customer's cash and securities and sends out statements describing the assets it holds "on deposit" for the customer. If the clearing firm becomes insolvent, it is SIPC's responsibility, not the introducing firm's, to make sure the customer's cash and securities are returned. For years this was the typical situation where SIPC came forward to protect customers. In recent years SIPC has expanded its coverage to include protection against unauthorized trading in customers' securities accounts. This coverage can include unauthorized trading by persons associated with the introducing firm and may be available even if the clearing firm is still solvent.

SIPC does not protect against market risk. It only protects the value of the securities held by the brokerage as of the time that a SIPC trustee is appointed. Thus, if a customer's securities decline in value at a time when the securities are inaccessible to the customer and before the SIPC trustee is appointed, the customer is out of luck. Since brokerages are more likely to go out of business in times of declining markets, this is a real concern. SIPC coverage is also limited to $500,000 per customer, including up to $100,000 in cash. SIPC only covers customers who have cash and securities on deposit for the purpose of securities transactions. SIPC does not protect customer funds placed with a

brokerage just to earn interest. This seems ironic since customer funds placed with a brokerage just to earn interest are more likely to belong to the elderly and others seeking safety first. If these individuals knew their interest earning funds were at risk in the event of an insolvency, would they choose to leave them at a brokerage? Finally, employees and other insiders of a brokerage are not protected by SIPC.

When SIPC was first established, the only customer protection mechanism was a liquidation procedure in bankruptcy court. Later amendments to the law gave SIPC the right to serve as a trustee in small cases (less than 500 customers and debts owed less than $750,000) and in even smaller cases (less than $250,000) to avoid going to court in a bankruptcy proceeding. This latter alternative is called a "direct payment procedure."

According to SIPC data, SIPC made net advances totaling an estimated $112 million to approximately 179,500 investors in 2001, compared to just $23 million paid out to 1,148 investors in 2000. The payments made by SIPC to investors in 2001 were roughly twice the previous one-year record of $63 million in 1981. The good news appears to be that SIPC is doling out more money to customers of insolvent brokerages; on the other hand, the number of investors in need of such help has apparently mushroomed.

According to SIPC, since inception through December 31, 2000 (the last year for which data is available) of the more than 427,000 claims "satisfied" in completed or substantially completed cases, a total of 307 involved claims which were greater than the limits of SIPC protection. Most of the 307 "unsatisfied" cases are said to have taken place before 1978 when SIPC coverage was increased. According to SIPC, since inception the unsatisfied number of cases increased by two in 2000 and the unsatisfied portion of claims increased $246,000 in 2000 to $36.8 million. However, for SIPC purposes, whether a claim is considered "satisfied" does not take into account any decline in the value of customer securities at a time when the securities are inaccessible to the customer and before the SIPC trustee is appointed. In other words, if SIPC gets you back the value of your securities at the time of the bankruptcy filing, it considers your claim "satisfied" even though your securities may have incurred a diminution in value during the period when the securities were inaccessible before the bankruptcy filing. Furthermore, the above data apparently does not include all the claims SIPC has denied outright. Full and accurate disclosure of SIPC's operations should include data regarding claims SIPC has denied and the basis for such denials.

In response to criticism from the General Accounting Office, SIPC completely overhauled its web site in 2001 to make it easier for investors to understand the organization and how to file claims. Included in the new site is the "SIPC Claim Center," which allows claims to be filled-out online. However, all original signed forms and related attachments still must be received by the designated trustee overseeing a liquidation proceeding. The basic brochure that SIPC provides to customers and the securities industry was completely reworked in 2001 to make it easier for investors to understand. The new brochure provides plain English answers to the seven most commonly asked questions about SIPC. It also emphasizes the need for investors to



document their concerns in writing as soon as they suspect that their funds are being mishandled.

Whether SIPC is fulfilling its stated mission of protecting investors of failed brokerages is open for debate. Does it offer investors full protection in the event of an insolvency? Absolutely not. There are significant gaps in the protection SIPC offers and far too many investors liken SIPC protection to FDIC coverage. It seems remarkable that in today's market environment where so many investors have lost so much, SIPC has been able to meet its obligations to investors without increasing the $150 a year fee it charges brokerages and without depleting its reserves. One has to wonder whether the protection afforded investors is meaningful.

However, the fundamental credibility issue SIPC faces is that it is funded and dominated by the brokerage industry. It is not a government agency and it is subject to an enormous conflict of interest, like the NASD. What is best for investors is not what is best for SIPC or brokerages. The more investors that are compensated, the higher the SIPC fees brokerages will be required to pay. The question remains whether the fate of investors of insolvent brokerages should be left in the hands of the brokerage industry. Are there not less conflict of interest-ridden alternatives that would offer investors greater protection?

## J. Mandatory Arbitration: Self-Adjudication for the Brokerage Industry

When investors are unable to resolve or settle their disputes with brokerages, they may choose to take legal action. Since 1987, the year in which the U. S. Supreme Court decided mandatory arbitration provisions in brokerage firm agreements with customers were enforceable disputes between brokerages and investors have increasingly been resolved through arbitration. NASD Dispute Resolution is by far the most active

Since mandatory arbitration was forced upon investors by brokerages, from the beginning arbitration has been viewed with suspicion by investors. Again, the NASD, an association whose membership consists of the very firms that are being sued, is responsible for establishing the policies and procedures used in NASD arbitrations. If you accept the argument that self-regulation is in the public's best interest, then "self-adjudication" is perhaps not too difficult to accept. However, for most investors the notion of being forced to resolve a matter with a brokerage before a tribunal that operates pursuant to rules approved by an association of brokerages is a little hard to swallow.

Assuming the amount in dispute is significant, an investor contemplating an arbitration action should retain an attorney experienced in securities arbitration matters. One resource available to investors is the Public Investors Arbitration Bar Association or PIABA, described below.

In response to criticisms, in 1992 the General Accounting Office (GAO) completed its first study investigating whether a pro-industry bias existed within securities and commodities arbitration. In that study, GAO was asked by Congress to compare arbitration results from thousands of cases to litigation and to the government-operated



commodities reparations system. The GAO's extensive statistical compilation and analysis apparently failed to find any quantitative indications of pro-industry bias. On the other hand, the GAO did suggest some remedial alterations to all forums.

The General Accounting Office has conducted several other studies regarding how investors fare in arbitration and investors' ability to collect awards when they win.

There is an ongoing debate as to whether investors are treated better, worse or simply "just as badly" in arbitration as in litigation with brokerages. Mandatory arbitration, initially forced upon investors by brokerages, has resulted in some hefty judgments against brokerages recently. Today more than a few brokerages are wondering if mandatory arbitration was such a good idea after all.

Since arbitration makes pursuing claims less expensive and more expeditious, some in the industry complain arbitration makes it too easy for customers to pursue frivolous claims by retaining lawyers who agree to represent them on a contingency fee basis. Investors seeking counsel to represent them in disputes against brokerages, on the other hand, generally complain that finding competent counsel is no simple matter. Unless the amount in dispute is significant, it is unlikely that any lawyer would be willing to handle a matter on a contingency basis, regardless of the merits of the case. For investors who have lost smaller amounts, the arbitration process is still formidable, i.e. lengthy, complex and costly; for those who have lost greater amounts, having to give their lawyer a third or more of any recovery is no bargain.

Another complaint regarding arbitration is that awards are normally made unaccompanied by factual or legal reasoning of the arbitrators, as would be provided in a decision of a court of law. In fact, it is said the system discourages arbitrators from providing their reasoning. Apparently the less reasoning arbitrators provide regarding their awards the less opportunity that exists for one of the parties to attack the validity of the award in a subsequent proceeding.

The NASD Dispute Resolution posts statistics regarding NASD arbitrations and mediations involving brokers and brokerages at nasdadr.com. According to the NASD, the data below includes arbitrations and mediations not involving customers, such as cases brought against firms by employees and other firms, as well as matters involving customers. While separating cases not involving customers from customer matters in its statistics would be meaningful to investors, the NASD does not distinguish between these different types of arbitrations in its publicly disclosed data. It has been estimated that less than 20% of all NASD arbitrations involve disputes between brokerages and their employees or disputes between brokerage firms. The statistics below do not include cases arbitrated in alternative forums, such as the New York Stock Exchange. It has been estimated that approximately 85-90% of customer cases are NASD arbitrated; an additional 10-15% are arbitrated at the New York Stock Exchange and other forums.

NASD new case arbitration filings for 2001 were up 24% from 5,558 to 6,915. Turnaround time for cases overall is slightly over a year. The number of arbitration cases



filed grew from 3,617 in 1990 to 6,915 in 2001. The total number of arbitration cases filed from 1990 to 2001 is 63,858. The estimated number of cases that will be filed in 2002 is 7,268.

Statistics regarding the type of controversy involved in *customer* arbitration cases are disclosed by the NASD. Failure to supervise, breach of fiduciary duty, misrepresentation, unsuitability and negligence are the most frequent offenses. Churning, surprisingly, is not so common. Online trading is a new category. Statistics regarding security types involved in customer arbitration cases are available, with common stocks involving the largest number of cases by far. Certificates of deposit were first tracked in January 2001.

Statistics regarding arbitration cases *closed* by year are disclosed by the NASD dating back to 1990, including *how* the cases were closed (but unfortunately only for the past four years). Adding to the confusion, these NASD statistics include cases *not* involving customers. The number of total arbitration cases closed since 1990 is 60,441 versus 63,858 that were filed. The percentage of cases that settled were: 1997- 38%; 1998- 33%; 1999- 38%; 2000- 41%; and 2001- 43%. If cases settled through mediation are included the percentages were: 1997- 47%; 1998- 47%; 1999- 51%; 2000- 55%; 2001- 55%. As discussed more fully later, neither settled arbitrations nor non-NASD arbitrations regarding firms are disclosed to the public through the NASD's Public Disclosure Program.

The number of cases closed by an arbitrator's decision "after a hearing" or arbitrator's decision "on the papers" was 1997- 32%; 1998- 35%; 1999- 30%; 2000- 31%; 2001- 30%. These NASD arbitration cases may be disclosed through the NASD's Public Disclosure Program (but not the Central Registration Depository), unless the matter is "expunged." ("Expungement" is explained below.)

With respect to all *customer* cases decided by arbitrators since 1997, according to NASD Dispute Resolution, customers were awarded damages in approximately 57% of cases. However, this impressive number disclosed by the NASD relates only to customer cases *decided by arbitrators* and not 100% of customer cases. It does not include cases withdrawn, or cases closed by bankruptcy of a critical party, stipulated award, uncured deficient claim, forum denied, stayed by court action, etc. The number of cases closed annually (including non-customer cases), which are neither settled nor decided by arbitrators, frequently exceeds 40% of the number of cases decided by arbitrators. For example, in 1998, 1918 cases were decided but 935 were withdrawn or otherwise closed. That is, the number of cases that ended by means other than a decision by an arbitrator amounted to approximately 49% of decided cases. In these cases presumably damages were not awarded to customers. If you factor in the number of cases that were not decided by arbitrators, which unfortunately includes non-customer cases, the percentage of cases where customers received an award may drop from the impressive 60% figure in 1998 disclosed by the NASD to approximately half that amount. Obviously, if customers only receive awards in 30% of cases finally decided by arbitrators, this is hardly an encouraging statistic for customers contemplating entering into an arbitration proceeding.

In conclusion, the arbitration data provided by NASD Dispute Resolution is confusing in that it fails to separate customer matters from non-customer matters. Statistics regarding how cases are closed (which the NASD possesses for longer periods) are inexplicably presented for only the past four years. Further, when the impressive data disclosed by the NASD related to the percentage of customer award cases is examined more closely, it is difficult to establish the legitimacy of the statistics. The statistics disclosed by the NASD are at a minimum questionable and if the reality is widely divergent from the disclosed statistics, as we have postulated, the statistics may be misleading to investors.

### 1. Public Investors Arbitration Bar Association (PIABA)

PIABA is a national bar association with members from 44 states and Puerto Rico. They have a toll free number (888) 621-7484 which investors can call for a list of attorneys who are members of PIABA and who have represented to PIABA that they fulfill its membership requirements. PIABA was established in 1990 as an educational and networking organization for securities arbitration attorneys who represent public investors in securities disputes. According to their website, piaba.org:

"PIABA members are involved in promoting the interests of the public investor in securities and commodities arbitration by: 1. protecting public investors from abuses in the arbitration process; and 2. making securities and commodities arbitration as just and fair as possible through legislative reforms to arbitration forum providers such as the AAA and the NASD. The mission of PIABA is to promote the interests of the public investor in securities and commodities arbitration by protecting public investors from abuses in the arbitration process, such as those associated with document production and discovery; making securities and commodities arbitration as just and fair as systematically possible; and creating a level playing field for the public investor in securities and commodities arbitration."

PIABA is a vocal advocate on behalf of investors that is not subject to the same conflicts of interest as the industry's self-regulator and self-insurer. Whether one agrees with PIABA's positions or not, institutional and retail investors alike can learn from the organization's commentary on specific issues, including matters such as SIPC protection and arbitration procedures.

### Part IV: Sources of Information Regarding Brokers and Brokerages

The NASD and its subsidiary NASD Regulation offer information about the brokerage industry that may be helpful to investors. Investors may wish to visit these organizations' websites at nasd.com and nasdr.com for information. In addition, the Securities Industry Association (SIA), an association of approximately 610 brokerages (including the largest), publishes an annual Securities Industry Fact Book and offers additional material regarding the industry at its website, sia.com. The information these organizations offer has been created by the industry itself and should be viewed as such. As we have pointed out throughout the Directory, much of the NASD and NASDR information is confusing and easily misinterpreted. Only limited critical commentary regarding the industry is

offered by these organizations. Certain information about the industry can also be obtained from the SEC, as described below.

The four primary sources of information regarding the *disciplinary histories* of specific brokerage firms are the Central Registration Depository, the state securities administrators, the SEC and the NASD's Public Disclosure Program.

**A. Central Registration Depository (CRD)**: The CRD is the registration and licensing system for the United States securities industry and its state and federal regulators and self-regulatory organizations. The first CRD system, developed jointly with the North American Securities Administrators Association (NASAA) and the NASD, was launched in 1981. Over the past two decades, the system has been expanded and modified to meet the evolving needs of its constituencies. The NASD and the state securities administrators jointly administer the CRD system today.

According to the NASD, "In operating the CRD system, NASD Regulation has followed procedures designed to ensure that the information in the system is accurate and complete. In establishing these procedures, NASD Regulation is guided by its mission of protecting investors and by CRD policy established with the North American Securities Adminstrators Association (NASAA) and the SEC."

As more fully discussed below, the CRD information is neither accurate nor complete. For example, neither firm arbitrations nor customer complaints are included in the CRD. Rather, the inefficiency and almost unbearable confusion related to CRD and the NASD Public Disclosure Program seems to reflect a compromise between the stated objective of investor protection and an equally compelling agenda of protecting the reputation of the brokerage industry.

All brokerages are required to file their registration forms (Form BD) through the CRD system. Brokerages are also required to file the registration forms (U-4 and U-5) of any of their employees who are registered with the NASD through the CRD system. These registration forms require a comprehensive listing of administrative information (personal, organizational, employment, registration, and other information) and disclosure information (information about criminal, regulatory and financial matters, including information related to customer disputes). "Customer dispute information" includes customer complaints, arbitration claims, court filings made by customers, and the arbitration awards or court judgments that may result from those claims, as well as allegations that a broker has engaged in certain types of misconduct.

In addition to Forms U-4 and U-5, the CRD system occasionally receives disciplinary information on Form U-6 from federal and state securities regulators or self-regulators regarding brokers and firms. The NASD believes the information reported on Form U-6 is highly reliable because this Form is filed by regulators or self-regulators, as opposed to the information provided by brokerage firms on Forms U-4 and U-5.

Information from CRD is not directly available to the public, except through subpoena to the NASD. Plaintiff's lawyers routinely subpoena the entire CRD record of a firm or



broker when they are pursuing a claim. This information is also available from the state securities regulators without a subpoena. However, when the information is obtained from the state and not subpoenaed, the lawyer must substantiate its origins in court. Thus, subpoenaing the information from CRD may be the preferable alternative for lawyers. Nevertheless, attorneys request information regarding brokerages from the states as well in order to obtain additional information regarding firms that is not part of CRD records, such as customer complaints received by the state.

In researching the disciplinary histories of individual brokers, CRD is far more useful than with respect to brokerage firms. Certain individual broker regulatory, customer complaint and arbitration information is available through the CRD. However, disclosure of brokerage firm customer complaint and arbitration information is not required on Form BD and therefore is not available through CRD. Brokerage firm customer complaint information is only available through the states, as described below. A limited amount of brokerage firm arbitration information is available through the NASD's Public Disclosure Program (see below).

With respect to brokerage firm arbitration information, the PDP provides greater disclosure than CRD; in all other respects, CRD provides more extensive information than the PDP. Sound confusing? You bet it is—and needlessly so.

Certain brokerage firm *regulatory* information must be reported on Form BD and this information is disclosed through the PDP. However, far more brokerage firm regulatory information is available through CRD. CRD distinguishes between "reportable" and "non-reportable" disclosures. "Reportable" information is information that is required to be reported on the current version of the uniform registration forms, i.e., Forms BD, U-4 and U-5. "Non-reportable" information is information that is not currently required to be reported on a uniform registration form. This information is not reportable because, according to CRD, it is out of date; was reported in error; or "some change occurred in either the disposition of the underlying event after it was reported or in the question on the form that elicited the information. Although not currently reportable, this information was once reported on a uniform form and, consequently, may have become a state record." CRD warns, "Users of this information should recognize that filers have no obligation to update non-reportable data; accordingly, it may not reflect changes that have occurred since it was reported."

For example, Salomon Smith Barney, Inc. has 185 regulatory actions disclosed on the PDP, and 62 reportable and 528 non-reportable disclosure events in its 573 page CRD file. Merrill Lynch, Pierce Fenner & Smith has 182 regulatory actions disclosed on the PDP, and 55 reportable and 598 non-reportable disclosure events in its 669 page CRD file. Prudential Securities Incorporated has 267 regulatory actions disclosed on the PDP, and 17 reportable and 696 non-reportable disclosure events in its 742 page CRD file. Morgan Stanley DW has 113 regulatory actions disclosed on the PDP, and 43 reportable and 399 non-reportable disclosure events in its 422 page CRD file. Therefore, the number of reportable and non-reportable disclosure events in a firm's CRD file apparently may be two or three times as great as the number of regulatory actions disclosed to the public

ATTACHMENT A

PAGE 31 OF 53

through the PDP. (The regulatory events disclosed through both the CRD and PDP may date as far back as the 1960s.)

Whether the information contained in a firm's CRD record is required to be disclosed on the most current registration form the industry has negotiated with regulators and its self-regulators should not be the standard for adequate disclosure to the public through the PDP. The public should receive the most complete information. The above comparative analysis of the CRD and PDP regulatory records suggests that the information the public receives regarding firms' regulatory histories through the NASD's PDP is incomplete. The public cannot possibly be conversant with the changes and nuances of Form BD reporting requirements. If the PDP is to provide investors with data, the data provided should be easily understood without myriad exceptions. And the data should not understate disciplinary actions.

There is simply no reason why the industry's self-regulator should offer the public a disclosure system that only provides limited regulatory information regarding firms— especially when the complete record is readily available through the CRD. In so doing, the NASD's Public Disclosure Program begins to look like a selling tool for the industry or a means for the industry to bolster public confidence.

CRD records also indicate the disclosure event questions the firm has answered affirmatively and negatively with reference to Form BD item numbers, branch offices of a firm and the name of the supervisor of each branch, affiliates of the firm, state registrations and types of business the firm conducts.

Department of Justice criminal information regarding firms which is received pursuant to a Form U-6 filing may be available through CRD if its disclosure is required on Form BD. Otherwise, such information is not furnished to the public both by the NASD and the state securities regulators.

**B. State Securities Regulators**: Every state has its own Division of Securities (or an agency that is similarly named) the public can contact for information regarding brokerages. The state securities regulators will provide investors with firms' CRD files. Again, the CRD files generally include far more information about brokerages *regulatory* histories than the NASD's Public Disclosure Program. (However, the PDP includes *arbitration* information about firms while CRD does not.)

In addition, the states can provide investors with important information regarding *investor complaints*. The number of customer complaints related to a firm is far more revealing than the number of customer arbitration cases decided by arbitrators for several reasons. First, many investors do not have the resources to bring an arbitration proceeding against a firm, especially after the firm has already lost or misappropriated a significant amount of their money. Thus, many investor complaints do not result in arbitration proceedings regardless of the merits of the customers' claims. Second, only cases that end in a final decision by arbitrators are reported on the PDP with respect to brokerages. Settled arbitrations and investor complaints are not disclosed through the

PDP. Third, the number of arbitrations (and types of cases) that result in a final decision that is included in the firm's disciplinary history, may reflect only those cases where the firm was relatively confident it would prevail or where the amount in dispute was so significant that the firm had to fight to the bitter end.

An investor wants to know, prior to conducting business with a brokerage, the likelihood that investing with the firm will result in an unpleasant outcome. Information regarding investor complaints, which is only available from the states on a firm-by-firm, state-by-state basis, is a better indicator of customer satisfaction. Data regarding finalized arbitration proceedings against firms is far less useful to investors, and in fact, is misleading as a measure of customer satisfaction.

The state customer complaint data refers to matters investors have gone to the trouble of contacting state regulators to complain about, presumably only after having attempted to resolve the matter with the firm. Thus, even the state customer complaint data is not truly indicative of customer satisfaction because not all customers contact state regulators regarding their complaints.

Investors can request from the states: a firm's full CRD report, a summary of the firm's registration to do business in the state (which is largely already in the CRD report), and copies of any files, complaints or records of concluded examinations or investigations conducted by the state. Records of investigations that are still open are not provided, and customer names, social security numbers and other information related to closed investigations will likely be redacted due to privacy concerns.

Criminal background information from the Department of Justice that is in state files is not disclosed to the public, unless such disclosure is or was once required on Form BD. For example, if a firm had been criminally investigated in the past but not convicted, disclosure of such information would not be provided to investors, even though the state would be aware of the criminal investigation in the firm's past.

Information from the states is easily obtainable—a subpoena is not required. Unlike the NASD's PDP which has a telephone hotline to provide immediate answers as to firms' or individuals' disciplinary histories and which can e-mail the relevant disclosures to the investor within two business days, information from the states may take longer to receive but may be more comprehensive. Note that states may charge for providing information to investors. Limited requests for information, such as for a firm's CRD information alone, may not result in a fee. However, since the states have literally truckloads of information regarding some firms, extensive costs may be incurred by investors seeking all state records of certain firms.

A request submitted regarding four firms to the Office of Comptroller, Department of Banking and Finance, State of Florida, for the amount of information available and from what source or sources the information is available resulted in the following response. The databases were queried from 1986 (inception) through to March 2002. The information was acquired from the Department's Licensing System, Activity Tracking

Systems (including both the old and currently used systems) and files that are kept both in-house and requested from the Department of State Archives Division which contain, but are not limited to, registrations, amendments, terminations, disciplinary information, financial records and agent information. The "boxes" of hard copy files referred to below measure 14" wide by 13" deep by 9.5" high.

| Firm | Examinations | Complaints | Boxes |
|---|---|---|---|
| Prudential Securities, Inc. | 34 | 693 | 5 |
| Merrill Lynch | 21 | 514 | 4.5 |
| Morgan Stanley DW | 27 | 352 | 2 |
| Salomon, Smith Barney | 11 | 117 | 5 |

The cost for requesting the above inventory of information, as opposed to the actual documents themselves, was approximately $162.00.

The above data relates to customer complaints received by the State of Florida alone regarding these four firms. There are, of course, 50 states. In order to very roughly estimate the number of customer complaints received nationally by state regulators with respect to these firms alone, one could simply multiply the Florida total of 1,676 by 50 and arrive at 83,800 customer complaints for four of the largest of the NASD's approximately 5600 member firms. If all 5600 firms had similar customer complaint data or, on average 419 complaints per state, the total would be approximately 21,000 complaints per firm nationwide or 11,732,000 for all NASD member firms since 1986. Obviously, Florida is one of the larger population states and the customer complaint data provided above relates to some of the largest NASD member firms. Thus, the almost 12 million customer complaint estimate for the brokerage industry may be misleadingly high, even though it does not include customer complaints related to NASD member firms no longer registered with the NASD due to insolvency or for other reasons. Inclusion of customer complaints regarding insolvent firms or firms no longer in existence would add significantly to the number of customer complaints nationwide. (Presumably insolvency of a brokerage results in numerous dissatisfied customers.)

On the other hand, the NASD's PDP data regarding only NASD arbitrated cases decided by an arbitrator, not including formerly registered NASD members, gives investors a very different picture of the brokerage industry. According to the PDP, Salomon Smith Barney, Inc., has 552 arbitrations, Merrill Lynch, Pierce Fenner & Smith has 858 arbitrations, Prudential Securities Incorporated has 836 arbitrations and Morgan Stanley DW has 629 arbitrations. The total for these firms is 2,875 NASD arbitrations nationwide. Total NASD arbitrations, as reported through the PDP for all firms, is 9,274. To suggest to investors that the number of NASD arbitrated cases involving firms decided by arbitrators is indicative of firm customer satisfaction is far too simplistic.

There is no reason why the PDP could not provide investors with customer complaint data from the states, including data related to former NASD member firms. The goal of disclosure is to provide investors with the information they need to make sound



investment decisions. Even if customer complaint data arguably overstated the problems related to doing business with brokerages, a regulator would prefer to err on the side of caution. A self-regulator subject to a conflict of interest may prefer to err on the side of its membership. Such an approach, however, is not consistent with the public interest.

The truth with respect to brokerage industry customer satisfaction nationwide is somewhere between the estimated 12 million customer complaints and the 9,267 decided NASD arbitrated cases reported to the public by the NASD. There is a world of difference between the two numbers. It would be irresponsible to suggest that investors rely on either number. Nevertheless, the more telling number of customer complaints is not reported to the public through the disclosure program operated by the industry's self-regulatory organization, while number of decided NASD arbitrated cases is disclosed.

### 1. North American Securities Administrators Association (NASAA)

Organized in 1919, the North American Securities Administrators Association (NASAA) is a voluntary association whose membership consists of 66 state, provincial, and territorial securities administrators in the 50 states, the District of Columbia, Puerto Rico, Canada, and Mexico. According to its website, "In the United States, NASAA is the voice of the 50 state securities agencies responsible for efficient capital formation and grass-roots investor protection." Investors may wish to contact NASAA, as well as their state securities regulator for guidance on particular issues. A list of all the state securities regulators is provided at the North American Securities Administrators Association's website at nasaa.org.

Since they are not employees of an Association whose membership consists of brokerages, state regulators are not subject to the same conflicts of interest as the NASD. The rules governing state securities regulators should be the protection of investors within

their state. Thus, the state regulator may be a more natural ally to the aggrieved investor. As mentioned earlier, however, state regulators are subject to political considerations that may limit their ability to assist investors. These regulators and NASAA may be reluctant to take strong positions that put them in direct opposition to the NASD's powerful membership or their state governments.

### C. Securities and Exchange Commission

While the SEC still theoretically has a role to play in the regulation of brokers and brokerages, i.e., providing "oversight" of the NASD, investors can gain little information or assistance from contacting the SEC about brokerage matters. The SEC's website, sec.gov, refers investors seeking to check on brokers and firms to the NASD's PDP. Information regarding SEC enforcement actions against brokerages that have been made public may be obtained from the SEC's website. This may make for interesting reading but is unlikely to benefit most investors. Form BD filings by brokerages may be obtained from the Commission's Public Reference Room for a fee; however, these Forms may be more easily obtained (for free) from state regulators since they are included in firm CRD files.

The SEC's website has information regarding the total number of complaints and questions the SEC received and responded to in 2000. As of this time, the website has not been updated with 2001 information. The amount of complaints and questions in 2000 increased by nearly 10% compared to 1999. Complaints rose 14% and the number of questions rose 7.5%. Since 1995, the complaints and questions received and responded to by the SEC has risen 88%.

Broker-dealer complaints increased for the third consecutive year and rose by approximately 9 percent in 2000 from approximately 12,000 to 13,000. Operational or service-related complaints continued to rise and were up about 11 percent in 2000. The leading operational complaints remained: transfer of account problems and failures to process or delays in executing orders. Meanwhile, sales practice complaints rose approximately 8 percent in 2000, reversing a 5-year decline. Typical sales practice complaints included: unauthorized transactions, misrepresentations, and failure to follow a customer's instructions.

Among the top ten complaints against broker-dealers, operational complaints, such as account transfer delays and order execution problems, were the most common, although transfer of account complaints decreased by 27 percent. Some sales practice complaints, such as misrepresentations to investors and unauthorized transactions, also declined. Three new categories of complaints were included in the SEC's top ten list: order processing errors, and margin sellout and best execution problems.

During 2000, the SEC received 4,271 complaints about online broker-dealers. This represents an increase of more than 27 percent compared to 1999. Since 1997, online trading complaints have risen over 814 percent. In summary, about a third of all SEC brokerage complaints appear to relate to on-line brokerages. It will be interesting to see

Investors may benefit from contacting the SEC regarding their specific problems with brokers and firms if they can convince someone at the Commission that the problem they are experiencing affects a large group of investors. Short of establishing a compelling case for SEC involvement, it seems the SEC has largely delegated to state regulators and the NASD all responsibility for matters between consumers and brokerage firms.

## D. NASD Public Disclosure Program

Section 15A of the Securities Exchange Act of 1934 requires a registered securities association to respond to inquiries regarding disciplinary actions involving its members and their associated persons. The Public Disclosure Program (PDP) was established in 1988 to permit certain types of disciplinary information regarding NASD member firms and their associated persons to be made available to the public. Following passage of the Penny Stock Reform Act of 1990, Congress required the NASD to establish and maintain a toll-free telephone number to receive inquiries. Investors may call the NASD's toll-free broker "hot line" at (800) 289-9999 or go to the NASD Regulation, Inc. website and inquire as to a given broker or firm. If the individual or firm has no disciplinary history,

the caller or on-line inquirer will be told so immediately. Registration information, such as whether a broker or firm is licensed to do business in a given state or has been suspended from the NASD, will be given immediately. However, disciplinary information, if any, regarding the broker or firm will be sent either by e-mail or regular mail. An e-mail response will generally be received within two business days but information sent regular mail may take weeks to receive, if it is received at all.

Public disclosure of disciplinary information regarding the NASD's membership is required under the federal securities laws, specifically Section 15 of the Securities Exchange Act of 1934. The PDP did not spring forth as a good faith offering to the American public by the NASD's membership in an environment lacking a statutory duty. It is important to keep this in mind when one considers the amount and nature of information that is made available through the PDP, as well as the efficiency of the system. Despite statements such as, "The NASD believes that the general public should have access to information which will help them in their determination whether to conduct or continue to conduct business with an NASD member …," the PDP has been a source of continuous controversy among the NASD's membership. Indeed, the NASD's response to the publication of this Directory reflects the reluctance of the Association to make information public.

Some of the information reported to the CRD system is made publicly available by the NASD through the PDP. Some of the information in the PDP, such as awards issued by arbitrators at the NASD, is not available through the CRD. Other information in the PDP is disclosed by the SEC and individual state securities regulators pursuant to applicable laws. It is important that investors realize that the information they receive from the PDP about a firm or broker is not the complete record. It may be simply the tip of the iceberg. As mentioned above, lawyers representing plaintiffs regularly subpoena the CRD and

the NASD's Public Disclosure Program.

NASD Regulation, on its website in an article entitled "What Information Is Disclosed Through the Public Disclosure Program," attempts to explain the incredibly complex rules governing what is and what is not disclosed regarding individuals and firms. The article is not entirely accurate and fails to point out many of the important disclosure caveats.

For *individual brokers*, the PDP provides the following information that is required to be reported on Form U-4:

1. Current employing firm and previous employer.

2. All approved registrations provided the individual is currently registered with the NASD or has been NASD registered within the past two years. Information regarding individuals who leave the securities industry for two years disappears from the PDP. Thus, if a broker wishes to "erase" his disciplinary problems, he may leave the industry and within two years emerge as a hedge fund manager, for example.

Individuals such as Michael Milken, Ivan Boesky and Frank Brennan have no disciplinary histories on the PDP today, if they ever did.

3   Criminal events, i.e., all felony charges and convictions and certain specified investment-related misdemeanor charges and convictions. Misdemeanors involving fraud, bribery, perjury, forgery, and extortion are disclosed. Note that in the case of brokerage firms, only felony charges and convictions and investment-related misdemeanor charges and convictions during the past ten years are disclosed.

4.  Regulatory actions taken against the individual by the SEC, CFTC, other federal regulators, states, self-regulatory organizations or foreign financial regulatory authorities that result in a finding of a violation and or sanction or the issuance of an order. An actual finding of a violation must be involved, not merely that an investigation was conducted some time in the past.

5.  Revocation or suspension of authorization to act as an attorney, accountant or federal contractor. (Same for individuals and firms.)

6.  Investment-related civil judicial actions. In the civil context, as opposed to the criminal mentioned above, the question of whether a matter is "investment-related" may be debatable and firms and individuals may take advantage of the ambiguity and fail to report civil judicial actions.

7.  Pending investigations and regulatory proceedings as to which the individual has received notice in writing that could result in a regulatory action as described above. The wording of this question grants individuals considerable leeway. For example, an individual may be aware that he is being investigated by the SEC or FBI, but has not

question and the PDP indicates no disclosure events until the individual has actually been found guilty. Note that individuals are required to disclose pending investigations, firms are not.

8.  Investment-related, consumer-initiated written complaints filed within the past 24 months alleging sales practice violations and damages of $5,000 or more. The complaint must be in writing and after two years, it is dropped from the PDP. This information regarding firms is not disclosed.

9.  Investment-related, written consumer-initiated complaints alleging forgery, theft, misappropriation or conversion of funds or securities which were filed within the past 24 months. After two years, the matter is dropped from the PDP. There is no minimum dollar amount when forgery, etc., is alleged. This information regarding firms is not disclosed.

10. Investment-related, consumer-initiated complaints involving sales practice violations that were ever settled for $10,000 or more. There is no two-year limitation here. This information regarding firms is not disclosed.

ATTACHMENT" A

PAGE 38 OF 53

11. Consumer-initiated, investment-related arbitration proceedings and civil litigations alleging sales practice violations which are either pending, resulted in an award or civil judgment against the individual regardless of amount, or were settled for $10,000 or more. Despite this requirement, many substantial settlements involving brokers are not reported. This information regarding firms is generally not disclosed.

12. Bonding company denials, payouts or revocations.

13. Outstanding judgments and liens.

14 Bankruptcy proceedings, compromises with creditors and direct payment procedures initiated under the Securities Investor Protection Act within the past 10 years.

15. Terminations after allegations of violation of investment-related statutes, regulations, rules or industry standards of conduct, fraud or wrongful taking of property, failure to supervise in connection with investment-related activity.

For *brokerage firms*, the PDP provides the following information that is required to be reported by the firm on the firm's Form BD:

1. Certain administrative information about the firm, such as address, legal status, types of business engaged in and states in which the firm is registered to do business. Other important information from Form BD, such as executive officers and ownership and relationships with other brokerages, is not disclosed.

2 Certain criminal events, i.e., all felony charges and convictions that occurred within convictions that occurred within the past ten years.

3. Regulatory actions initiated by the SEC, CFTC, other federal regulatory agencies, foreign financial regulatory authorities, states and self-regulatory organizations that result in a finding of violation and/or sanction or the issuance of an order. Note that records of regulatory actions against firms are disclosed for the longest periods. Regulatory actions 35 years and older may be disclosed. Arbitration records begin around 1987—when the U. S. Supreme Court upheld mandatory arbitration. However, bankruptcies, criminal and certain civil judicial matters over ten years old are not disclosed regarding firms.

4. Revocation or suspension of authorization to act as an attorney, accountant or federal contractor. (Same as for individual brokers.)

5. Pending regulatory proceedings that could result in a regulatory action as described above. Note that for individual brokers pending regulatory investigations, as well as pending regulatory proceedings, must be disclosed. The reason for the difference in treatment between firms and individuals is unclear.

6. Investment-related civil judicial actions, such as injunctions entered in the past ten years in connection with investment-related activity and findings or settlements involving violations of investment-related statutes or regulations brought by a state or foreign financial regulator (not subject to a ten-year limitation). Only investment-related civil judicial actions must be disclosed. Only settlements with certain regulators are disclosed.

7. Pending investment-related civil proceedings that could result in a "reportable" civil judicial action. If the pending action would not be "reportable," then the matter would not be disclosed on the PDP. There is room for discretion in determining whether the pending matter could result in a "reportable" action. Firms may simply await the final outcome to report. After all, until the matter is finally resolved, anything can happen.

8. Bankruptcy proceedings and direct payment procedures initiated under SIPC within the past ten years. (See discussion of SIPC for explanation of direct payment procedures.)

9. Bonding company denials, payouts and revocations.

10. Unsatisfied judgments or liens.

In summary, there are 15 categories of information that are disclosed regarding brokers and only 10 (or 11 including arbitration cases discussed below) regarding firms. The reason why brokers should be subject to greater disclosure requirements than firms is unclear. The result is that individual broker misdeeds frequently do not become part of NASD member brokerages' disciplinary histories.

As mentioned earlier, an exception to the rule that more information can be obtained from the CRD or the states than from the PDP concerns arbitration cases brought against brokerage firms. The PDP provides information regarding arbitration awards *rendered in the NASD's arbitration forum* that involve securities or commodities disputes between firms *and their public customers*. The arbitration award information provided through the PDP includes decided cases dating back to around 1987. That is, firm arbitration awards reported on the PDP are not subject to any ten-year limitation.

Firm arbitration information is not required to be reported on Form BD and is therefore not available through the CRD system. Firm arbitration information is reported for disclosure through the PDP "via a slightly different mechanism," according to the NASD. Summary information regarding arbitration awards involving securities disputes between customers and firms is updated and disclosed on firm public disclosure reports by the NASD generally within 10-15 days after the arbitration award is signed and served on all the parties. The NASD admits it is aware that in the past there were occasional delays in posting firm related arbitration awards to the PDP. "NASD recently made modifications to the mechanism that updates PDP information to eliminate these delays as part of its continuing commitment to expedite regular and timely updates of firm arbitration

xl

information to the PDP. Nevertheless, requesters should be aware of these processing and posting delays when requesting or relying on PDP reports."

As a supplement to the PDP, the full text of arbitration awards issued by arbitrators at the NASD *and at other arbitration forums* is available online through a "cooperative arrangement" between NASD Dispute Resolution and the Securities Arbitration Commentator at www.nasdadr.com. The awards are generally available within a month after the arbitration award is signed and served upon all the parties. To access the information regarding an arbitration award, the NASD suggests that you first view the summary information via the PDP, then use the case number included in the PDP report to access the full text of the award. Since the NASD obviously has access to arbitration awards from other arbitration forums, the question arises as to why these awards are not included in the PDP data.

It is critical to remember that the PDP generally includes only information provided to the CRD by firms and brokers. In substantially all cases, the information provided through the PDP represents the verbatim record as it was reported to the NASD. Thus, firms have great latitude and exercise tremendous creativity in how they choose to characterize the matters they disclose and when. Broker comments, firm comments and regulator comments appear verbatim on a PDP report as they were provided to the CRD on Forms U-4, U-5 and U-6. They are not written by the NASD or edited by the NASD in any way.

However, according to the NASD, in certain limited circumstances, the NASD combines information about a single event that was reported by different sources. For example, a record reporting information on an event that was submitted by a firm may contain information reported on the same event that was submitted by a regulator. When the older CRD system or "Legacy CRD" operating since 1981 was converted in 1999 to Web CRD (the internet-based CRD), some of the data reported prior to 1999 was reformatted.

## 1. The PDP "Big Firm Exception"

There is an important "big firm" exception to the PDP. If an investor requests disciplinary information regarding some of the largest firms, such Lehman Brothers, Morgan Stanley DW, Merrill Lynch, Prudential or Salomon Smith Barney, the information is only available via regular mail and not by e-mail. The on-line requestor will receive an e-mail message indicating that the firm disciplinary report requested exceeds 1.5. megabytes in size and the PDP does not support e-mail delivery of reports greater than 1.5 megabytes. It generally takes the NASD several weeks to get the information to the requestor, if it is sent at all. Since these are the largest firms, with tremendous branch networks carpeting the country, and collectively are responsible for the majority of the nation's brokerage activity, the effectiveness of the PDP as an investor education vehicle is severely undermined by inefficiencies related to responding to investor requests for information regarding these firms. If he or she has to wait several weeks to receive due diligence materials, the investor will likely make a decision of whether to conduct business with a firm before the materials arrive.



The "big firm" exception is an enormous weakness of the PDP and there is simply no reason for it. The summary data regarding each of these firms could easily be provided via e-mail. The summary data indicates substantial disciplinary histories for each of these largest firms.

An argument could be made that providing the summary data regarding these firms to the public without the accompanying narrative explanations from the PDP is prejudicial to the firms; however, if protection of the investor is the primary objective of the PDP, then any prejudice to the firms should only be a secondary concern. Moreover, it seems unlikely that an investor who has the opportunity to review the full disciplinary information regarding these firms, as opposed to a summary, would find additional comfort. The "big firm" exception or the delay related to requesting information on these firms likely results in discouraging investors from requesting information regarding them. It would be interesting to learn how many requests for information regarding these firms the PDP processes. However, the NASD is extremely guarded about PDP statistics. In fact, "guarded" would be a polite word for describing PDP telephone representatives. In most cases, they claim to be uninformed regarding the rationale for the PDP's almost paranoid procedures, as well as the parameters of the data they are discussing. The response to serious questioning tends to be, "Why do you want to know?" Questions relating to how the system operates are met with suspicion, hostility and delay. The structure of the PDP seems to be designed to dismiss inquiries as soon as possible, as opposed to fostering investor education. This is not surprising since the program is, in effect, administered by the industry.

The identity of the party requesting information from the NASD or its subsidiaries may determine whether the information requested is ever received. The media and other critics of the NASD or the securities industry experience the greatest difficulty in obtaining information.

## 2. Other Exceptions to the PDP

Understanding what is *not* disclosed on the PDP is as important and confusing as understanding what is.

First, disclosure information on firms and individuals no longer registered with the NASD is not provided to the public once the firm or individual has been terminated for two years. This "purging" of bad brokers and firms from the system results in unreliable data regarding the industry. Furthermore, individuals who wish to have their misdeeds fade from public scrutiny may simply leave the industry and after two years be free of their pasts. Firms that are "suspended" by the NASD are not considered terminated and remain on the PDP until two years after the NASD terminates them, if ever. At what point in time "suspended" firms are terminated is unclear.

Second, information that: (1) has not in fact been reported to the CRD, (2) is not required to be reported, or (3) is no longer reportable on Form U-4 or Form BD is not disclosed through the PDP. Thus, if a firm simply fails to report a matter that it may be required to

report, the matter will not be disclosed to the public until such time as a regulator discovers the omission and chooses to compel disclosure, if ever.

Examples of information that is not required to be reported or is no longer reportable include non-investment related misdemeanors originally reported in error. Recall that only specified investment-related misdemeanors are required to be reported. Other examples include judgments and liens originally reported as pending that subsequently have been satisfied and bankruptcy proceedings filed more than ten years ago.

Third, the PDP does not include non-NASD arbitration cases. As mentioned earlier, it is estimated that 10-15% of arbitration cases are filed in alternative forums. These arbitration cases are not included in the PDP data regarding firms.

Fourth, the PDP does not include arbitrations and civil matters that are settled (unless a regulator is involved) or otherwise do not result in a final decision. Recall that certain customer-initiated complaints are required to be reported on a *broker's* Form U-4 and disclosed through the PDP for two years in connection with the broker's disciplinary history. Consumer complaints that were *ever* settled for $10,000 or more are disclosed on the PDP with respect to brokers and are not subject to a two-year limitation. Brokers have long complained that brokerage-employers are willing to settle smaller cases over their objections because these settlements are not be reflected on the firm's CRD and PDP record, only the brokers. The broker may wish to fight the smaller customer complaint since the settlement will be reflected on his or her record indefinitely. Due to the conflict of interest between firm and broker, brokers are advised to retain their own counsel in these cases.

Fifth, the PDP does not include customer complaints against firms, i.e. matters which do not result in arbitration claims. Oddly enough, NASD Regulation on its website nasdr.com, provides statistics regarding regulatory actions, including customer complaints received. The number of complaints received by NASDR each year was: 1998- 5,957; 1999- 6,391; 2000- 6,584; 2001- 5,155. Apparently these figures include only those customer complaints that result in a regulatory action. Why is this information not provided to investors through the PDP in connection with firm inquiries? Further, if the NASD has data regarding total customer complaints received annually regardless of whether they resulted in a regulatory action, why is this information not made available to investors?

Statistics regarding customer complaints received by state regulators, the SEC and the NASD, are readily available. Whether substantial duplication exists regarding these numbers is unknown. However, as stated earlier, customer complaint data is a far better indicator of customer satisfaction with brokerages than the number of final decisions related to only NASD arbitrations.

Sixth, disputes between brokerages and their employees and between brokerage firms are not publicly disclosed through the PDP. Cases involving sexual harassment or age or racial discrimination, wrongful termination, failure to pay employees and other matters,

which may be relevant to investors in determining whether to do business with a firm, are not included. Thus, in a situation where a brokerage is experiencing financial difficulties and employee funds are misappropriated to meet current obligations of the firm, employee cases filed against the firm which could serve as an "early warning" to customers are not disclosed. When the firm eventually collapses, customers are caught by surprise and employees, not protected by SIPC, are out of money and jobs.

### 3. Expungement

The NASD permits disciplinary information regarding a broker or firm to be "expunged" or deleted from the CRD and PDP under "certain limited circumstances." "Expungement" is a highly controversial practice which has been of growing concern to state regulators and investor advocacy groups as the practice has become commonplace. Expungements result in reducing the number of arbitrations that are disclosed to the public. As indicated below, it appears that only 15% of all NASD arbitrated customer disputes over the past ten years are disclosed through the PDP. What percent of the cases are not disclosed as a result of "expungement" in unknown.

According to the NASD, "As the operator of the CRD system with primary responsibility for maintaining its integrity, NASD regulation also has an obligation to consider compelling issues involving personal privacy and fundamental fairness. Accordingly, NASD Regulation, working with the SEC, NASAA, other members of the regulatory community, and member firms, has endeavored to establish procedures reasonably designed to ensure that the information submitted to and maintained on the CRD system is accurate and complete. These procedures... cover the expungement of information from the CRD in narrowly defined circumstances. Expungement is a remedy provided by federal and state law in certain circumstances that usually is effected through a court order. Since the inception of the CRD system in 1981, court-ordered expungements generally have been honored. Arbitrator-ordered expungements that met certain requirements also were honored until January 1999. In January 1999, after consultation with the NASAA, NASD Regulation imposed a moratorium on arbitrator-ordered expungements from the CRD system. Under the moratorium, which is still in effect, NASD Regulation will not expunge information from the CRD system based on a directive contained in an arbitration award rendered in a dispute between a public customer and a firm or its associated persons, unless that award has been confirmed by a court of competent jurisdiction."

Apparently the "moratorium" wasn't a true moratorium because arbitrators were not ordered to stop issuing expungements. Instead the NASD added a "safeguard" which required parties to get a court to validate the arbitration panel's order. The reality was that if the arbitrators signed the award, the court just "rubber-stamped" it.

In response to lobbying from NASAA and PIABA, the NASD proposed a set of rules and policies intended to make it more difficult for brokers to have customer complaints expunged from their CRD and PDP records. According to NASAA, an agreement regarding expungements could be near. Under the new proposed rules, the extraordinary

xliv

relief of expungement would be permitted only in cases of mistake or error, where a claim has no legal merit, or if the information in the CRD is determined to be defamatory. It remains to be seen if the NASD's membership will go along with the new proposed rules. The NASAA seems prepared to hang tough on the issue.

## E. Initial Analysis of PDP Industry Data

Initial analysis of the PDP data revealed the following: of a total of 5326 firms, only 2155 have disciplinary records. That is, approximately 60% have no disciplinary histories whatsoever disclosed to the public through the PDP.

One explanation could be that many NASD member firms are quite small and, as a result, are less likely to experience disciplinary problems. The largest firms and other members of the Securities Industry Association number only 610 yet conduct the vast majority (90%) of the nation's securities activity. The other almost 90% of NASD member brokerages is responsible for only 10% of the nation's securities activity. (On the other hand, it has been observed that smaller firms are more likely to experience disciplinary actions due to their lack of sophisticated in-house compliance personnel.) Another explanation for the absence of PDP disciplinary data regarding the majority of NASD members is, as has previously demonstrated, a great deal of data is excluded from the PDP through the many loopholes in the disclosure systems.

It is perhaps worthwhile to distinguish, category-by-category, between the average number of events for all firms, including the 60% that have no disciplinary records; the average number of disciplinary events for those firms that have one or more occurrences of the disciplinary event in question and the average number for the larger firms, such as the firms included in the "big firm" exception to the PDP.

Only two of the 5326 firms have criminal actions. Recall only certain criminal events (i.e., all felony charges and convictions and certain specified investment-related misdemeanor charges and convictions that occurred within the past ten years) are required to be disclosed. The low number of firms with criminal actions reported could be attributable to a tendency of firms with criminal actions to terminate business operations, either voluntarily or involuntarily. (Recall firms that cease to be registered are removed from the PDP after 2 years.) Also, the lack of criminal actions may be indicative of a failure by law enforcement to pursue white-collar criminal cases.

There were 2008 firms with one or more regulatory actions. Total regulatory actions for all firms was 8855. The average number of regulatory actions per firm was 1.66. The average number for firms with one or more regulatory events was 4.41. The average number for the "big firm exception" firms was 201. Again these regulatory action figures are of limited value since the number of regulatory actions against firms, as disclosed through the CRD, may be two to three times as great as the number disclosed through the PDP.

There were only 701 firms with arbitration cases in their history. Total arbitrations for all firms was 9274. The average number of arbitrations per firm was 1.74. Average number



ATTACHMENT A "

PAGE 45 OF 53

for firms with one or more arbitrations was 13.23. The average number for "big firm exception" firms was 771. Note that approximately 31% of total arbitrations relate to firms that are subject to the "big firm exception" of the PDP. Information regarding these arbitrations is not promptly disclosed to investors, if ever. According to the NASD, the total number of NASD arbitration cases filed since 1990, including non-customer matters, is 63,858. Non-customer arbitrations and firm customer arbitrations that are settled, withdrawn or "expunged" are not disclosed through the PDP. If almost 64,000 NASD arbitrations were filed and only 9,274 are disclosed to the public, then less than 15% of arbitrations brought against firms are disclosed through the PDP. The number of cases disclosed through the PDP seems remarkably low, less than two arbitrations per firm over a fifteen-year period! Again, non-NASD arbitrations are not disclosed.

Many of the arbitrations summarized in the Public Disclosure Program with respect to "disposition" indicate "case is closed, by hearing" or "case is closed, by papers." In these cases, all relief sought by the plaintiff has been denied and the case closed either after a hearing or after a review of the papers filed in connection with the case. Others indicate "award against party" and indicate the amount awarded.

There were 156 firms with civil judicial actions in their history. Total civil judicial actions for all firms was 234. The average number of civil judicial actions per firm was 0.04, or an average of 1.5 for firms with civil judicial histories. The average number of civil judicial actions for "big firm exception" firms was 0.60. Again, only investment-related civil judicial actions that are not settled are disclosed. Settled actions are not disclosed unless brought by a regulator.

No firms had reported bankruptcies. Only bankruptcy proceedings and direct payment procedures initiated under SIPC within the past ten years are disclosed.

There were 102 firms with "bond" events in their history. These are bonding company denials, payouts and revocations. Total bond actions for all firms was 162. The average number of bond actions per firm was 0.03, or an average of 1.59 for firms with bond histories. The average number of bond actions for "big firm exception" firms was 0.

There was only one firm with unsatisfied judgments or liens.


## Part V: Conclusion

As we noted at the outset, a thorough due diligence review of brokerage firms prior to investing and on an ongoing basis makes sound financial sense for both individual investors and fiduciaries. However, an analysis of regulation of the industry and the sources of information available regarding brokerages indicates that such a due diligence review is virtually impossible for all but the most sophisticated investors. The information that is available to investors is confusing, incomplete and misleading. The disclosure systems are cumbersome and seem calculated to discourage anything other than superficial inquiries. Investors simply cannot rely upon the CRD, PDP, SEC, or state

data alone. Yet piecing together a complete picture of even a single firm from the fragments of information available from these sources is challenging, to say the least. It is striking how little can be established with confidence about any firm through this maze of exceptions, loopholes and conflicting definitions. The current state of affairs is not beneficial to investors seeking to make informed decisions regarding brokerages with which to do business. Furthermore, the current disclosure scheme does not reward brokerages that are beyond reproach because it does not provide investors with industry disciplinary averages or permit a broad comparison between firms which would identify the most meritorious. It only shields the less scrupulous brokerages from public scrutiny.

There are significant differences between the information individual brokers and brokerage firms are required to disclose. There is no apparent reason for these different disclosure obligations and the result is that firm disciplinary histories are frequently unencumbered by the misdeeds of their broker-employees. While this state of affairs may be in the best interest of the member firms of the industry's self-regulatory organization, it is not consistent with the goal of investor protection.

To summarize our findings, 60% of all NASD member firms have no disciplinary histories whatsoever disclosed through the PDP. Data regarding the estimated millions of nationwide brokerage firm *customer complaints* is not disclosed through the PDP. This information is only available from the states on a state-by-state, firm-by-firm basis. Comprehensive customer complaint information is not compiled by the states, the SEC or the NASD, even though each apparently keeps records on the number of complaints they receive annually. Only data regarding NASD *arbitrations* is reported with respect to firms. Arbitration cases from other forums, perhaps an additional 10-15%, are not included (even though the NASD has access to these awards). Cases that end short of a final decision by arbitrators are not disclosed. Cases decided by arbitrators that are subsequently "expunged" are not disclosed. Arbitrations between brokerages and their employees and between firms are not disclosed. Only 15% of NASD arbitration cases filed are disclosed through the PDP—less than two arbitrations per firm over a 15-year period. Only one-half to a third of *regulatory actions* in CRD are disclosed to the public through the PDP. Only two *criminal actions* and no *bankruptcies* are disclosed through the PDP. Data regarding firms that become insolvent, are expelled by the NASD or otherwise cease business operations is removed from the PDP within two years, thereby purging the system of its most damning statistics.

We submit that these findings indicate that the NASD's Public Disclosure Program is woefully inadequate as an investor education or due diligence tool.

As we also noted at the outset, the brokerage industry is unique in that it has been permitted to self-regulate, self-insure, self-adjudicate and even control the information the public receives about brokerages. The degree of control the NASD and its members has been granted may well explain the tangled web investors seeking to conduct serious due diligence reviews encounter.

It is our hope that this Directory will be important resource for educating investors on the issues involved in reviewing brokerages. The very fact that the publication of this book has been so strongly opposed by the industry's self-regulator, alone, should be enough to convince even the most skeptical of the need for change.

## About the Author

Edward Siedle formerly served as an attorney with the U. S. Securities and Exchange Commission and as Director of Compliance and Associate Legal Counsel with one of the largest international money management firms. Since 1990, he has owned and operated several institutional brokerages firms, all of which have been members in good standing of the NASD. He is regarded as an expert in the securities and money management industries and conducts investigations of brokerage and money manager abuses on behalf of pension funds and other institutional clients. He holds all licenses required to operate a brokerage. He frequently provides expert commentary to the media regarding current developments in the brokerage industry and articles he has written are often reprinted in financial publications.

ATTACHMENT __A__

PAGE __48__ OF __53__


**NASD**
REGULATION
An NASD Company

February 22, 2002

*VIA FACSIMILE AND U.S. MAIL*
Edward A. H. Siedle, Esq.
President
Benchmark Financial Services
2856 Northeast 32nd Street
Lighthouse Point, FL 33064

Dear Mr. Siedle:

This follows up on our February 5, 2002 telephone conversation regarding the data you obtained from the NASD's Public Disclosure Program (PDP), the methodology you used in obtaining that data, and your intention to use the PDP for commercial purposes. In our conversation, you acknowledged that you had retained a "technical consultant" to copy the broker-dealer data that resides in the database that supports the NASD's PDP. You also reaffirmed that you intended to republish the data you obtained in a directory of broker-dealers that you intend to sell, on a subscription basis, to interested parties.

I informed you at that time (as well as on previous occasions) of NASD's concerns regarding your use of the PDP and the data residing therein for commercial purposes. Please be advised that the NASD has not in any way authorized you to use or consented to your use of the PDP data for your stated purpose. Moreover, we are reviewing whether your method of accessing, compiling and using the PDP data is consistent with the Terms and Conditions of use of the PDP and PDP information, as set forth in the binding subscription agreement on the NASD PDP Web site, as well as with the policies under Interpretive Material 8310-2, which is the NASD rule that governs the Program.

Accordingly, you are hereby notified that the NASD has not consented to your use of the compilation of the broker-dealer data acquired from the PDP database for publication in the broker-dealer directory you have described or for any other commercial use. Should you attempt to use this data for those purposes, the NASD will pursue all legal remedies available to it. If you have questions regarding this matter, please contact me at 240.386.4821.

Sincerely,

Richard E. Pullano Chief Counsel/Director
CRD/Public Disclosure

Cc: Terri Reicher
Laurie A Dzien
Office of General Counsel

ATTACHMENT A
PAGE 49 OF 53



**NASD**
**REGULATION**
An NASD Company

October 2, 2001

Edward A. H. Siedle, Esq.
President
Benchmark Financial Services
2856 Northeast 32nd Street
Lighthouse Point, FL 33064

Dear Mr. Siedle:

This is in response to your letters dated July 20, August 1 and August 27, 2001, and
follows up on our August 23 telephone conversation in which you shared with us your
proposal for publishing and selling, on a subscription basis, an informational directory of
broker-dealers (the "Siedle Directory"). You have indicated that this directory would be
published periodically, and that it would include administrative information about broker-
dealers (e.g., addresses and telephone numbers), as well as disciplinary information
about such firms. You have further indicated that you may also wish to provide a "rating"
to firms in the directory based on certain criteria, including disciplinary histories. As part
of your proposal, you have requested some type of direct or enhanced access to the
data that serves as the source for NASD Regulation's Public Disclosure Program.

As we discussed, the policies governing the disclosure of information through NASD
Regulation's Public Disclosure Program are established by NASD Regulation and
approved by the Securities and Exchange Commission. NASD Regulation's policy for
making public information it receives in connection with its registration process or

Under IM-8310-2, NASD Regulation makes information available though our web site
under "About Your Broker" or by calling a toll-free number (1.800.289.9999). While we
do not object to your accessing the Public Disclosure Program consistent with the
policies underlying IM-8310-2 and the terms and conditions applicable to the Program,
we are not able to offer any additional or enhanced access.

I trust this is responsive to your inquiry.

Sincerely,

Richard E. Pullano
Chief Counsel/Associate Director
CRD/Public Disclosure

cc:    R. Clark Hooper
       Derek W. Linden

       Annette Nazareth, Director
       Division Of Market Regulation, Securities and Exchange Commission

ATTACHMENT _A_

PAGE _50_ OF _53_

# NASD Public> <Disclosure> <Program>
# Terms and Conditions

1.  Information provided through the <Public> <Disclosure> <Program> shall be used ONLY:
    a.  to assist in determining whether to conduct or continue to conduct securities or commodities business with NASD® Member Firms or Associated Persons;
    b.  in judicial proceedings or arbitration proceedings relating to securities or commodities transactions; or
    c.  for other non-commercial purposes consistent with the promotion of just and equitable principles of trade and the protection of investors and the public interest.

2.  Provision of information by the National Association of Securities Dealers, Inc. and its subsidiaries (collectively, the "NASD") pursuant to the <Public> <Disclosure> <Program> does not constitute a waiver of any of the NASD's rights, privileges, or immunities with respect to the furnishing of disciplinary or registration information.

3.  The NASD receives disclosure information from registered persons, member firms, government agencies, and other sources, and there may be delays in the receipt and processing of such information. Information submitted on current filings about NASD registered firms and individuals requires at least 15 business days of processing by the NASD before it can be viewed on this site or provided on a-<Public> <Disclosure> <Program> report.

4.  The NASD does not charge for this service, which is offered pursuant to the NASD's responsibilities as a **Self-Regulatory Organization, and, in particular, pursuant to Section 15A(i) of the Securities Exchange Act of 1934. In the provision of this service, the NASD makes no warranties of any kind, and disclaims liability to any person for any actions taken or omitted in good faith with respect to this <Public> <Disclosure> <Program>. The NASD is not responsible for and cannot verify information from sources other than the NASD, and does not warrant or guarantee the accuracy or completeness of the information requested. Neither the NASD nor any affiliate or supplier shall be liable for any cause of action in contract, tort, or otherwise, for more than the incremental telecommunications cost incurred to connect to the service. Notwithstanding the above, neither the NASD nor any affiliate or supplier shall be liable for any loss of income, trading loss, or consequential, incidental, or indirect damages, regardless of whether NASD has been informed of the possibility of such damages.**

5.  Disclosure information on firms and individuals no longer registered with the NASD may occasionally be reported to and maintained by the NASD; however, such disclosure information has not been reviewed by the firms and individuals, and there is no regulatory requirement that terminated firms and individuals report any disclosure information to the NASD.

6.  The <Public> <Disclosure> <Program> includes only information provided to the CRD. In substantially all cases, the information provided through the <Public> <Disclosure> <Program> represents the verbatim record as it was reported to NASD Regulation, Inc. However, in certain limited circumstances, NASD Regulation combined information about a single event that was reported by different sources (e.g., a record reporting information on an event that was submitted by a firm may contain information reported on the same event that was submitted by a regulator). This condition occurred when the data in the Legacy CRD system was converted (i.e., reformatted and transferred) to Web CRD, the Internet-based Central Registration Depository. This condition affects a small percentage of records reported to NASD Regulation prior to August 1999. These converted records contain information that was reported to NASD Regulation in accordance with appropriate reporting protocol applicable to the source place (e.g., firms and regulators); however, because of the combination of information from different reporting sources, a record disclosed through the <Public> <Disclosure> <Program> may not reflect the actual filing submitted to NASD Regulation.

7.  The "Broker comments," "Firm comments" and "Regulator comments" appear verbatim as they were provided to CRD via Forms U-4, U-5, and U-6. They were not written by the NASD and have not been edited by the NASD in any way.

8.  I understand that this service employs proprietary software. I agree that I will not give, sell, or license another person or entity access to the <Public> <Disclosure> <Program>, and I will not use any software, hardware, or system that permits multiple persons concurrent use of the <Public> <Disclosure> <Program.

By clicking the button below, I certify that I have read and understand all of the terms set forth above and intend to form a binding subscription agreement with the NASD on those terms. If I am accepting this agreement on behalf of an organization, I certify that I have authority of that organization to enter into this agreement.

**Agree**

[Go Back To Results] [Next Doc]

ATTACHMENT _A_

PAGE _51_ OF _53_

# NASD Public Disclosure Program
# Terms and Conditions

1.  The National Association of Securities Dealers, Inc. ("NASD®") collects, compiles, organizes, indexes, digitally converts and maintains regulatory information from registered persons, member firms, government agencies and other sources and maintains information in the proprietary Central Registration Depository ("CRD®") database. NASD releases such information through NASD's Public Disclosure Program ("PDP"), which provides information from the CRD system to the investing public. Your access to PDP information through NASD's PDP Web site does not transfer any rights in CRD or PDP to you.

2.  Your use of the PDP Web site is conditioned upon your acceptance, without modification, of all terms and conditions of this Agreement. Any information accessed, requested or provided through this Web site must be accessed, requested or used in accordance with the terms and conditions specified in this Agreement. NASD reserves any rights not expressly granted under these terms and conditions. Additionally, NASD reserves the right, at its sole discretion, to modify the terms and conditions for use of the PDP Web site at any time by changing this Agreement, and any changes are effective immediately.

3.  PDP is a proprietary database and employs proprietary software, but NASD makes no exclusive proprietary claim to the information in the PDP that is not created by NASD. You are neither restricted nor prohibited by NASD from obtaining a copy of any original filing or information from a non-NASD source.

4.  The information provided through the NASD Public Disclosure Program shall be used ONLY for your own personal or professional use, and in accordance with all other terms and conditions of this Agreement:
    a.  to assist you, your clients or your organization in determining whether to conduct or continue to conduct securities or commodities business with NASD member firms or their associated persons;
    b.  to assist you, your clients or your organization in judicial proceedings or arbitration proceedings relating to securities or commodities transactions; or
    c.  for non-commercial purposes consistent with the promotion of just and equitable principles of trade and the protection of investors and the public interest.

5.  The information provided to you through the NASD Public Disclosure Program is provided to you ONLY for your own personal or professional use. All other uses are prohibited. You agree that you will not duplicate, download, publish, publicly display, modify or otherwise distribute the information retrieved from this PDP Web site for any purpose other than as expressly permitted by this Agreement. In no event may you offer to others any information retrieved from the PDP for commercial purposes, or as part of a subscription service or similar arrangement. You agree that you will not use the information retrieved from the PDP web site to develop or create a database of information to be sold, licensed or made otherwise commercially available. You agree that you will not use any robot, spider, other automatic device, or manual process to monitor or copy the PDP information in bulk, or to make voluminous, excessive or repetitive requests for information. You further agree that you will not use any device, software or routine to bypass any software or hardware that prohibits volume requests for information, you will not interfere with or attempt to interfere with the proper working of the PDP Web site, and you will not take any action that imposes an unreasonable or disproportionately large load on the Web site.

6.  All requests for permission to access or use the Public Disclosure Program for uses other than those described in Paragraphs 4 or 5 of this Agreement must be made in writing to NASD clearly stating the purpose and manner in which PDP is proposed to be used. Requests may be submitted to NASD Regulation, Public Disclosure Program, 9509 Key West Avenue, Rockville, Maryland, 20850. NASD, in its sole discretion, may approve or reject any request that is inconsistent with the terms and

7.  Provision of information by NASD (and its subsidiaries) pursuant to the Public Disclosure Program does not constitute a waiver of any of the NASD's rights, privileges, or immunities with respect to the furnishing of disciplinary or registration information.

8.  **The NASD does not charge for this service, which is offered pursuant to the NASD's responsibilities as a Self-Regulatory Organization, and, in particular, pursuant to Section 15A(i) of the Securities Exchange Act of 1934. In the provision of this service, the NASD makes no warranties of any kind, and disclaims liability to any person for any actions taken or omitted in good faith with respect to this Public Disclosure Program. The NASD is not responsible for and cannot verify information from sources other than the NASD, and does not warrant or guarantee the accuracy or completeness of the information requested. Neither the NASD nor any affiliate or supplier shall be liable for any cause of action in contract, tort, or otherwise, for more than the incremental telecommunications cost incurred to connect to the service. Notwithstanding the above, neither the NASD nor any affiliate or supplier shall be liable for any loss of income, trading loss, or consequential, incidental, or indirect damages, regardless of whether NASD has been informed of the possibility of such damages.**

9.  Member firms, registered persons, government agencies, and other sources file disclosure information with the NASD. Consistent with its responsibilities as a self-regulatory organization, the NASD performs a regulatory review of the disclosure information filed before it makes the information available through the Public Disclosure Program. Most disclosure information is available through the PDP within two business days of being filed. In certain limited circumstances, disclosure information may not be available through the Public Disclosure Program within the usual timeframe, but will be made available as soon as practicable.

10.  Consistent with policies and procedures approved by the Securities and Exchange Commission (SEC), the NASD will disclose information on individuals and firms, through the PDP, for two years after the termination of the individual's or firm's NASD registration. Disclosure information reported to the NASD after an individual or firm has terminated may not have been reviewed by the firm or individual; in addition, firms and individuals who are no longer registered are not required to independently report such information.

11.  The Public Disclosure Program includes only information provided to the CRD. In substantially all cases, the information provided through the Public Disclosure Program represents the verbatim record as it was reported to NASD or its subsidiary, NASD Regulation, Inc. However, in certain limited circumstances, NASD combined information about a single event than was reported by different sources (e.g., a record reporting information on an event that was submitted by a firm may contain information reported on the same event that was submitted by a regulator). This condition occurred where the

ATTACHMENT _A_ 4/10/02

PAGE 52 OF 53

data in the Legacy CRD system was converted (i.e., reformatted and transferred) to Web CRD, the Internet-based Central Registration Depository. This condition affects a small percentage of records reported to NASD prior to August 1999. These converted records contain information that was reported to NASD in accordance with appropriate reporting protocols applicable to the source filers (e.g., firms and regulators); however, because of the combination of information from different reporting sources, a record disclosed through the Public Disclosure Program may not reflect the actual filing submitted to NASD.

12. The "Broker comments," "Firm comments" and "Regulator comments" appear verbatim as they were provided to CRD via Forms U-4, U-5, and U-6. These comments were not written by the NASD and have not been edited by the NASD in any way. The NASD reserves the right to redact customer names, confidential customer information, or offensive or potentially defamatory language from a Public Disclosure Report consistent with policies and procedures approved by the SEC.

By clicking the button below, I certify that I have read and understand all of the terms set forth above and intend to form a binding agreement with the NASD on those terms. If I am accepting this agreement on behalf of an organization, I certify that I have authority of that organization to enter into this agreement.



ATTACHMENT: A
PAGE 53 OF 53                4/10/02

# NASD Public> <Disclosure> <Program>
## Terms and Conditions

1. Information provided through the <Public> <Disclosure> <Program> shall be used ONLY:
   a. to assist in determining whether to conduct or continue to conduct securities or commodities business with NASD® Member Firms or Associated Persons;
   b. in judicial proceedings or arbitration proceedings relating to securities or commodities transactions; or
   c. for other non-commercial purposes consistent with the promotion of just and equitable principles of trade and the protection of investors and the public interest.
2. Provision of information by the National Association of Securities Dealers, Inc. and its subsidiaries (collectively, the "NASD") pursuant to the <Public> <Disclosure> <Program> does not constitute a waiver of any of the NASD's rights, privileges, or immunities with respect to the furnishing of disciplinary or registration information.
3. The NASD receives disclosure information from registered persons, member firms, government agencies, and other sources, and there may be delays in the receipt and processing of such information. Information submitted on current filings about NASD registered firms and individuals requires at least 15 business days of processing by the NASD before it can be viewed on this site or provided on a <Public> <Disclosure> <Program> report.
4. The NASD does not charge for this service, which is offered pursuant to the NASD's responsibilities as a Self-Regulatory Organization, and, in particular, pursuant to Section 15A(i) of the Securities Exchange Act of 1934. In the provision of this service, the NASD makes no warranties of any kind, and disclaims liability to any person for any action taken or omitted in good faith with respect to this <Public> <Disclosure> <Program>. The NASD is not responsible for and cannot verify information from sources other than the NASD, and does not warrant or guarantee the accuracy or completeness of the information requested. Neither the NASD nor any affiliate or supplier shall be liable for any cause of action in contract, tort, or otherwise, for more than the incremental telecommunications cost incurred to connect to the service. Notwithstanding the above, neither the NASD nor any affiliate or supplier shall be liable for any loss of income, trading loss, or consequential, incidental, or indirect damages, regardless of whether NASD has been informed of the possibility of such damages.
5. Disclosure information on firms and individuals no longer registered with the NASD may occasionally be reported to and maintained by the NASD; however, such disclosure information has not been reviewed by the firms and individuals, and there is no regulatory requirement that terminated firms and individuals report any disclosure information to the NASD.
6. The <Public> <Disclosure> <Program> includes only information provided to the CRD. In substantially all cases, the information provided through the <Public> <Disclosure> <Program> represents the verbatim record as it was reported to NASD Regulation, Inc. However, in certain limited circumstances, NASD Regulation combined information about a single event that was reported by different sources (e.g., a record reporting information on an event that was submitted by a firm may contain information reported on the same event that was submitted by a regulator). This condition occurred when the data in the Legacy CRD system was converted (i.e., reformatted and transferred) to Web CRD, the Internet-based Central Registration Depository. This condition affects a small percentage of records reported to NASD Regulation prior to August 1999. These converted records contain information that was reported to NASD Regulation in accordance with appropriate reporting protocols applicable to the source filers (e.g., firms and regulators); however, because of the combination of information from different reporting sources, a record disclosed through the <Public> <Disclosure> <Program> may not reflect the actual filing submitted to NASD Regulation.
7. The "Broker comments," "Firm comments" and "Regulator comments" appear verbatim as they were provided to CRD via Forms U-4, U-5, and U-6. They were not written by the NASD and have not been edited by the NASD in any way.
8. I understand that this service employs proprietary software. I agree that I will not give, sell, or license another person or entity access to the <Public> <Disclosure> <Program>, and I will not use any software, hardware, or system that permits multiple persons concurrent use of the <Public> <Disclosure> <Program.

By clicking the button below, I certify that I have read and understand all of the terms set forth above and intend to form a binding subscription agreement with the NASD on those terms. If I am accepting this agreement on behalf of an organization, I certify that I have authority of that organization to enter into this agreement.

| Agree |

---

[Go Back To Results] [Next Doc]

ATTACHMENT: B

PAGE 1 OF 1

# NASD Public> <Disclosure> <Program>
# Terms and Conditions

1.  The National Association of Securities Dealers, Inc. (ôNASD«ö) collects, compiles, organizes, indexes, digitally converts and maintains regulatory information from registered persons, member firms, government agencies and other sources and maintains information in the proprietary Central Registration Depository (ôCRD«ö) database. NASD releases such information through NASDÆs <Public> <Disclosure> <Program> (ôPDPô), which provides information from the CRD system to the investing public. Your access to PDP information through NASDÆs PDP Web site does not transfer any rights in CRD or PDP to you.

2.  Your use of the PDP Web site is conditioned upon your acceptance, without modification, of all terms and conditions of this Agreement. Any information accessed, requested or provided through this Web site must be accessed, requested and used in accordance with the terms and conditions specified in this Agreement. NASD reserves any rights not expressly granted under these terms and conditions. Additionally, NASD reserves the right, at its sole discretion, to modify the terms and conditions for use of the PDP Web site at any time by changing this Agreement, and any changes are effective immediately.

3.  PDP is a proprietary database and employs proprietary software, but NASD makes no exclusive proprietary claim to the information in the PDP that is not created by NASD. You are neither restricted nor prohibited by NASD from obtaining a copy of any original filing or information from a non-NASD source.

4.  The information provided through the NASD <Public> <Disclosure> <Program> shall be used ONLY for your own personal or professional use, and in accordance with all other terms and conditions of this Agreement:

    a.  to assist you, your clients or your organization in determining whether to conduct or continue to conduct securities or commodities business with NASD member firms or their associated persons;

    b.  to assist you, your clients or your organization in judicial proceedings or arbitration proceedings relating to securities or commodities transactions; or

    c.  for non-commercial purposes consistent with the promotion of just and equitable principles of trade and the protection of investors and the public interest.

5.  The information provided to you through the NASD <Public> <Disclosure> <Program> is provided to you ONLY for your own personal or professional use. All other uses are prohibited. You agree that you will not duplicate, download, publish, publicly display, modify or otherwise distribute the information retrieved from this PDP Web site for any purpose other than as expressly permitted by this Agreement. In no event may you offer to others any information retrieved from the PDP for commercial purposes, or as part of a subscription service or similar arrangement. You agree that you will not use the information retrieved from the PDP web site to develop or create a database of information to be sold, licensed or made otherwise commercially available. You agree that you will not use any robot, spider, other automatic device, or manual process to monitor or copy the PDP information in bulk, or to make voluminous, excessive or repetitive requests for information. You further agree that you will not use any device, software or routine to bypass any software or hardware that prohibits volume requests for information, you will not interfere with or attempt to interfere with the proper working of the PDP Web site, and you will not take any action that imposes an unreasonable or disproportionately large load on the Web site.

6.  All requests for permission to access or use the <Public> <Disclosure> <Program> for uses other than those described in Paragraphs 4 or 5 of this Agreement must be made in writing to NASD clearly stating the purpose and manner in which PDP is proposed to be used. Requests may be submitted to NASD Regulation, <Public> <Disclosure> <Program>, 9509 Key West Avenue, Rockville, Maryland, 20850. NASD, in its sole discretion, may approve or reject any request that is inconsistent with the terms and conditions of use of the PDP.

7.  Provision of information by NASD (and its subsidiaries) pursuant to the <Public> <Disclosure> <Program> does not constitute a waiver of any of the NASD's rights, privileges, or immunities with respect to the furnishing of disciplinary or registration information.

8.  The NASD does not charge for this service, which is offered pursuant to the NASD's responsibilities as a Self-Regulatory Organization, and, in particular, pursuant to Section 15A(i) of the Securities Exchange Act of 1934. In the provision of this service, the NASD makes no warranties of any kind, and disclaims liability to any person for any actions taken or omitted in good faith with respect to this <Public> <Disclosure> <Program>. The NASD is not responsible for and cannot verify information from sources other than the NASD, and does not warrant or guarantee the accuracy or completeness of the information requested. Neither the NASD nor any affiliate or supplier shall be liable for any cause of action in contract, tort, or otherwise, for more than the incremental telecommunications cost incurred to connect to the service. Notwithstanding the above, neither the NASD nor any affiliate or supplier shall be liable for any loss of income, trading loss, or consequential, incidental, or indirect damages, regardless of whether NASD has been informed of the possibility of such damages.

9.  Member firms, registered persons, government agencies, and other sources file disclosure information with the NASD. Consistent with its responsibilities as a self-regulatory organization, the NASD performs a regulatory review of the disclosure information filed before it makes the information available through the <Public> <Disclosure> <Program>. Most disclosure information is available through the PDP within two business days of being filed. In certain limited circumstances, disclosure information may not be available through the <Public> <Disclosure> <Program> within the usual timeframe, but will be made available as soon as practicable.

10. Consistent with policies and procedures approved by the Securities and Exchange Commission (SEC), the NASD will disclose information on individuals and firms, through the PDP, for two years after the termination of the individualÆs or firmÆs NASD registration. Disclosure information reported to the NASD after an individual or firm has terminated may not have been reviewed by the firm or individual; in addition, firms and individuals who are no longer registered are not required to independently report such information.

11. The <Public> <Disclosure> <Program> includes only information provided to the CRD. In substantially all cases, the information provided through the <Public> <Disclosure> <Program> represents the verbatim record as it was reported to NASD or its subsidiary, NASD Regulation, Inc. However, in certain limited circumstances, NASD combined information about a single event that was reported by different sources (e.g., a record reporting information on an

ATTACHMENT_____C

event that was submitted by a firm may contain information reported on the same event that was submitted by a regulator). This condition occurred when the data in the Legacy CRD system was converted (i.e., reformatted and transferred) to Web CRD, the Internet-based Central Registration Depository. This condition affects a small percentage of records reported to NASD prior to August 1999. These converted records contain information that was reported to NASD in accordance with appropriate reporting protocols applicable to the source filers (e.g., firms and regulators); however, because of the combination of information from different reporting sources, a record disclosed through the ≤Public≥ ≤Disclosure≥ ≤Program≥ may not reflect the actual filing submitted to NASD.

12. The "Broker comments," "Firm comments" and "Regulator comments" appear verbatim as they were provided to CRD via Forms U-4, U-5, and U-6. These comments were not written by the NASD and have not been edited by the NASD in any way. The NASD reserves the right to redact customer names, confidential customer information, or offensive or potentially defamatory language from a Public Disclosure Report consistent with policies and procedures approved by the SEC.

By clicking the button below, I certify that I have read and understand all of the terms set forth above and intend to form a binding agreement with the NASD on those terms. If I am accepting this agreement on behalf of an organization, I certify that I have authority of that organization to enter into this agreement.

Agree

---

[Go Back To Results] [Next Doc]

ATTACHMENT: C
PAGE 2 OF 2